Joshua J. Flores
650 S. Town Center Dr # 1012
Las Vegas,  NV  89144
702-743-8830

## IN  THE  UNITED  STATES  DISTRICT  COURT

## FOR  THE  DISTRICT  OF  NEVADA

| | | |
|---|---|---|
| Joshua  J.  Flores, | ) | |
| | ) | |
| Plaintiff, | ) | **2:11-cv-00349-KJD -PAL** |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| American  Eagle  Airlines  Inc. | ) | COMPLAINT: |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## MOTION TO VACATE AND REMAND ARBITRATION AWARD

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COMES NOW, JOSHUA J. FLORES,** Plaintiff, representing  himself  pro se,  filed  a  complaint, styled "motion  to vacate,  and  remand  arbitration  award." Pursuant  to  the  Federal Arbitration  Act, 9 U.S.C. § 10,  against  defendant,  American  Eagle  Airlines,  Inc., asserting  this  Motion  to  Vacate  Arbitration  Award  and  would  respectfully  show  the Court  the  following:

Dated: March 04, 2010

Joshua. J. Flores
650 S. Town Center Dr # 1012
Las Vegas,   NV  89144

Tel: 702.743.8830

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................3

II.    BACKGROUND OF BOTH PARTIES ............................................................5

III.   THE PROCEEDING .........................................................................................8

    A.     Arbitrator Exceeded Their Authority By Ignoring Clear Language Of Contract,
          & Procedural Due Process ..............................................................................8

    B.     Company Adds Reasoning For Discharge during the Arbitral Tribunal ..................11

    C.     The Award Was Contradictory .........................................................................12

    D.     The Tribunal's Disregard To The Contractual Commuting Policy ...............................14

    E.     The Tribunal Manifestly Disregarded the Law, "Disparate Treatment/
          Retaliation." ...............................................................................................15

    F.     Change Of Testimony After Being Sworn Under Oath .........................................19

IV.    UNDER U.S. LAW, THE AWARD SHOULD BE VACATED AND
       REMANDED TO A NEW TRIBUNAL .............................................................20

    A.     Governing Law: The Federal Arbitration Act ....................................................20

    B.     Governing Law: Article 944.10 (3) Code Of Civil Procedure .............................21

V.     CONCLUSION ..................................................................................................21

## JURISDICTION

The U.S. Airline industry is governed by the Railroad Labor Act (45 U.S.C. §§151-188) April 1936. The Court has jurisdiction over this motion to vacate an arbitration award under, the Railroad Labor Act 45.U.S.C chapter 8 §153(q) & The Federal Arbitration Act, 9 U.S.C. § 10. Because the arbitration raised questions of Federal law, and residency of the plaintiff, Venue is appropriate for the District of Nevada.


## I.    INTRODUCTION

Pursuant to Section 10 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10, Plaintiff, Joshua J. Flores ("Mr. Flores") moves this Court to vacate the award ("the Award") (Grievance No: 133-0510) entered on December 7th 2010, before American Eagle Airlines (" The Company") pilots system board of adjustments between both claimants, Mr. Flores & Airline Pilots Assoc. International, AFL - CIO (" The Union") and American Eagle Airlines Inc. (" The Company") In addition Mr. Flores moves this court to vacate, and remand arbitration award.

Based on well-settled principles of U.S. arbitration law and precedent, this Court should vacate the Award because the arbitrator, Joyce M. Klein, engaged in misconduct by effectively refusing to knowledge evidence pertinent and material to the controversy; engaged in misbehavior by which Mr. Flores rights have been prejudiced; exceeded their powers, or so imperfectly executed them, that a  final, and definite award on a matter not submitted to them or there is an error in the form of the award, not affecting the merits; and acted in manifest disregard of the law.

Specifically, the Tribunal failed to decide one, of  many Mr. Flores claims during the arbitration process under the collective bargaining agreement, but most important, Sec.20.A.4. In addition to the tribunal irregious award, the Tribunal disregarded and failed to apply the proper legal standard, to uphold the obligation it has to respect the terms of the contract between both parties. *(Article 944.10(3) Code of Civil procedure, & Coderre v Coderre,)* even though when ample evidence on that issue was in fact in the record. Finally, The tribunal based its' consideration of the merits issue on the absence of key evidence. Mr. Flores urges this court to vacate, and remand arbitration award, and correct the obvious deficiencies in the Award. Mr. Flores urged the Tribunal to consider the evidence it had obviously overlooked.

As a result of this misconduct, the Award remains incomplete and contradictory, and disregarding controlling legal principles. U.S. courts have long circumscribed their review of arbitral awards based on the expectation that the arbitrators would uphold the integrity of the arbitral process. Where, however, the arbitrators breach the integrity of the arbitral process, the principle of arbitral autonomy must yield to judicial review.

Plaintiff Exhibits are cited as "Ptf. Ex_", Joint Exhibits as "Jt. Ex. _"; Company Exhibits as "Co. Ex. _" and ALPA Exhibits as "ALPA Ex._ ."References to the tribunal transcript are cited with "TR" followed by the page number(s) and the name of the witness in parentheses unless the identity of the witness is obvious from the context.

## II.   BACKGROUND OF BOTH PARTIES

American Eagle, a wholly owned subsidiary of AMR Corporation, is a large regional airline with over 12,000 employees, including approximately 2800 pilots with about 1700 flights per day throughout North America. Eagle's pilots are represented by the Air Line Pilots Association (ALPA). Eagle and ALPA are parties to a collective bargaining agreement initially effective September 1, 1997.

Joshua Flores began working for Eagle as a pilot based at Chicago's O'Hare International Airport (ORD) on March 17, 2008. (T. 127-128) Until the incident that led to his termination on March 13th, he had a clean disciplinary record. While working for Eagle, Mr. Flores lived in Las Vegas, Nevada and commuted to ORD on various airlines. (T. 131).

On March 13, 2010, Mr. Flores was assigned to a 2:00 p.m. to 10:00 p.m. ready-reserve shift. (T. 130-131). Mr. Flores had planned to commute to work on a 6:00 a.m. United flight from Las Vegas with a scheduled arrival in Chicago a little after 11 :00 a.m. (T. 131). Mr. Flores called crew scheduling to let them know that he would be late for his 2:00 p.m. shift and told them he planned to take an American flight that was scheduled to depart from Las Vegas at 8:55 a.m. and arrive in Chicago at 2:20 p.m. (T. 134). That flight experienced air traffic delays, so Mr. Flores called crew scheduling again and called his friend First Officer Duc Phan. (T. 136). Mr. Flores gave First Officer Phan his sign-in information and asked him to sign him in because he "didn't want to have to answer to Frank on two late reports." (T. 136). When the American flight was delayed, Mr. Flores called crew scheduling again and took a United flight scheduled to arrive in Chicago at 2:53 pm (T-139)

When Mr. Flores arrived, Captain Loftus asked if he had anything to tell him "about today" (T. 52) I was running late today, I called crew scheduling a few times to let them know I was running late, and I just got in a little bit ago. T-138 (Flores)

Captain Loftus told him that he was withholding him from service pending an investigation of the sign-in while he was on a flight to Chicago. (T. 5253, 139, C. Ex. 7). The next day (Sunday, March 14th), Flores called Loftus. TR 143 (Flores); ALPA Ex. 12 (Line 200). During this phone conversation, Flores told Loftus that another pilot had signed in for him on March 13th• TR 143 (Flores). Flores admitted to Loftus that he had "messed up," apologized for his actions, and asked if there was anything he could do to help Loftus in the investigation. Loftus thanked Flores for being honest with him. T-144 (Flores) Flores also talked to Duc Phan on March 14th to let him know that Loftus was aware that someone had signed in for Flores, and that he (Flores) apparently was in trouble for it. TR 143 (Flores); TR 212 (Phan); ALPA Ex. 12 (Line 219).

Captain Loftus did not remember receiving a phone call from Flores on Sunday March 14th and appeared to be doubtful that Flores had called him, Flores' phone records (ALP A Ex. 12) and the testimony of Froscher, Phan, and Flores confirm that Flores did call Loftus on the 14th.

Phan called Loftus on either Monday or Tuesday (March 15th or 16th) and identified himself as the person who had signed in Flores. Loftus asked Phan to stop by the office the next time he was scheduled to work and Phan did so on March 17th Loftus requested a written statement from Phan, which Phan provided at that time (ALPA Ex. 10) and then Phan left to fly his scheduled trip. TR-214 (Phan). Loftus did not withhold Phan from service at that time. TR 79 (Loftus).

During his investigation, Loftus only listened to a recording of one of the three phone conversations that Flores had with Scheduling on March 13th • TR 70; 101 (Loftus). Loftus testified during the System Board hearings that he did not recall what time that phone conversation had occurred. Loftus testified that he heard Flores volunteering for some flying on that tape. As Loftus described it, " There was some conversation about another pilot, oh, I know he's a commuter; I could do that flight for him or something along those lines." TR 107.

Later on March 13th • TR 144 (Flores). Dan Pavel was the ALPA representative who attended the meeting with Flores. TR 112 (Pavel); TR 145 (Flores). Eric Rehm, an assistant chief pilot, was also present for the company. TR 113 (Pavel). In this meeting, Flores repeated what he had already told Loftus about the events of March 13th -the calls to Scheduling due to running late, having to change flights, and asking another pilot to sign in for him. TR 113 (Pavel). Flores also disclosed that Duc Phan was the pilot who had signed in for him. TR 145 (Flores). Loftus asked Flores to submit a written statement which Flores provided (Co. Ex. 9). TR 113 (Pavel); TR 145 (Flores). Loftus ended the meeting by telling Flores that "he appreciated his ... honesty ... and told him that that would hold some weight with him." TR 115 (Pavel).

The Air Line Pilots Association, International, AFL-CIO ("Union" or "ALPA") filed a grievance against American Eagle Airlines, Inc. (the "Company" or "Eagle") claiming that the Company did not have just cause for the termination of Joshua Flores (the "Grievant"). The grievance remained unresolved and was submitted to arbitration before the System Board of Adjustment pursuant to the parties' Agreement.

The System Board of Adjustment conducted hearings on August 24 and 25, 2010 in Fort Worth, Texas. At the hearing. the parties argued orally, examined and cross-examined witnesses, and introduced documentary evidence into the record. Testimony was received from Chief Pilot Frank Loftus; Captain Daniel Pavel (via telephone), ALPA Representative; Captain Michael Froscher, ALPA Representative; Grievant Joshua Flores, Captain Brian Sweep, ALPA MEC Grievance Chairman; First Officer Duc Phan; Matt Bartle, Eagle Counsel for Employee Relations; Assistant Chief Pilot Eric Rehm; and First Officer Vincent George. Hearing transcripts were prepared by a certified court reporter. Post hearing briefs were received by October 25, 2010 at which time the record was closed. ( Ptf Ex.2)

## III.   THE PROCEEDING

### A.   ARBITRATOR EXCEEDED THEIR AUTHORITY BY IGNORING CLEAR LANGUAGE OF THE CONTRACT & PROCEDURAL DUE PROCESS.

A brief recasting of the factual and procedural background of this case will aid in putting the basis for this motion in context.

Pursuant to Section 10 of the Federal Arbitration Act, 9 U.S.C. § 10, a(4) Federal Arbitration Act, 9 U.S.C. § 11, C. & Article 944.10(3) Code of Civil procedure. An Arbitrator has the obligation to respect the terms and conditions of the contract agreed to by the parties. *(Article 944.10(3) Code of Civil procedure, & Coderre v Coderre,)* Arbitrator Joyce M. Klein in the tribunal award ruled that, "these potential contractual violations are not sufficient to outweigh Mr. Flores conduct." ( Ptf Ex.1)

**Section 20.E.1 a pilot is entitled to have an Association representative present at any step of an investigation or grievance process. "Jt Ex.1**

**Section 20.A.4, of the pilots' agreement requires the Company will provide at least twenty-four (24) hours' notice in order for the pilot to obtain representation, with the following exceptions: for drug or alcohol testing; or theft; or serious misconduct, which in good faith requires an immediate investigation. " Jt. Ex.1**

The board agreed that the "following exceptions" (listed above) are not applicable here.

(Ptf Ex.1) According to the manual for the Company's progressive discipline program,

Peak Performance Through Commitment (Alpa Ex.1 pg 24) for manager's and Supervisor.

(chief pilot)

> **PPC (Peak Performance Through Commitment)**
>
> **Right To Representation;**
>
> **\* When investigating any matter which may eventuate in corrective action(s) (Advisory)**

The arbitrator concluded that on March, 13th Captain Loftus (chief pilot/supervisor)

called Mr. Flores into his office without explanation and without giving him notice

that he was investigating a possible "deception." (Ptf Ex.1 pg,18)  Captain Loftus' efforts to

assist Mr. Flores were ill-advised, (Ptf Ex.1 pg,18) Captain Loftus should have begun the

meeting by informing Mr. Flores that his false sign-in was under investigation.

(Ptf Ex.1 pg,18) Captain Loftus had taken initial steps to commence an investigation of

Mr. Flores' conduct before speaking with him. (Ptf Ex.1 pg,18) The company

acknowledged that Captain Loftus had taken steps, such as checking on Mr. Flores' flight

with United Airlines, before advising him that he was withheld from service pending

investigation. (Ptf Ex.1 pg,18) *& (T-83)*

-9-

Captain Loftus does not dispute this testifying that he "tried to give him an opportunity to come clean at that point in time ... " (Ptf Ex.2) T-53 (Loftus)

The company assured that it's Flight Department policy not to speak with a pilot who is subject to a pending investigation meeting without the presence of the Union. Captain Loftus would have violated this policy had he spoken to Mr. Flores without Union participation. T-270 (Rehm)

### Section 20.A.2, of the pilots' agreement requires the Company will conduct a fair, impartial timely investigation before disciplining or discharging a pilot. " Jt. Ex.1

A strict application of Sec.20.A.4, is required for a fair and impartial investigation.

Captain Loftus should have not question Mr. Flores without ALPA representation on March 13th. (Ptf Ex.3 pg, 20 ) Captain Loftus should have given Mr. Flores the opportunity to obtain ALPA representation on Match, 13th. This procedural error was an issue brought to the tribunal but failed to rule on this matter.

Captain Loftus then set a formal investigation meeting for March 17th, providing well more than 24 hours notice to Mr. Flores in compliance with Sec.20.A.4. (Ptf Ex.1 pg 18)

The issue brought to the tribunal was for union representation on March 13th (Ptf Ex.3 pg 27,28 ) not March 17th. The tribunal refusing to knowledge evidence pertinent and material to the controversy; engaged in misbehavior by which Mr. Flores rights have been prejudiced.

The Seventh Circuit has held that arbitrators have "imperfectly executed "their powers where "the award itself, in the sense of judgment, order, bottom line, is in complete in the sense of having left unresolved portion of the parties' dispute.

## B.   The Company Adds Reason[s] For Discharge In The Tribunal

**Section.20.A.7 of the pilots' agreement requires all notices of disciplinary action or discharge will be in writing and will state the action taken and the reason(s) therefore. Jt. Ex.1  (final Advisory)**

The "final advisory" States the reasoning for termination was because Mr. Flores request another pilot to sign him in, and Mr. Flores was concerned that he would have received a late report. These were a direct violation of rules 5, 34.  (Jt. Ex 3, Co Ex 2)

It is a well-established arbitral principle that a <u>"discharge 'must stand or fall upon the reason given at the time of discharge'; the employer cannot add other reasons when the case reaches *arbitration*."</u> *How Arbitration Works at 977, quoting from West Va. Pulp & Paper Co., 10 Lab. Arb. (BNA) 117, 118 (Guthrie, Arb.1947)*

I elected to terminate him under Rule 34. T-61, (Loftus) Why discharge under these circumstances. T-61 (Co.)  As the arbitral tribunal began, the company suggested that <u>Rule 34 goes farther and covers theft benefitting oneself.</u> (T-23) as the grievan in this case did. (T-23) Josh was gaming the system to get something for nothing. He was trying to tell the company that he was here at 2:00 to get the <u>benefits of the pay and the per diem,</u> and he wasn't here. And that basically is <u>theft.</u> It might be small amount, but <u>theft</u> is <u>theft.</u> T-61 (Loftus)  American Eagle Airlines (" The Company ") and the tribunal award made it very clear that a rule 34 covers theft benefitting oneself *(T-23)* Rule 16 prohibits dishonesty when there's not -- if not involving benefit to oneself. T-23 (Co.) Rule 34 goes farther and covers theft benefitting oneself. T-23 (Co.) Rule 34 is

required of any individual found to have violated the rule. (T-13) Rule 34 covers, serious incidents of dishonesty, whether criminal or not, of which this is one. (Ptf Ex.1 pg,19)

The tribunal must respect the terms in the contact and not allow the company to add or change the reasoning for termination when the case reaches arbitration. This would violate a fair and impartial hearing. Not to mention a breach of contract.

### C.     The Award Was Contradictory

It is undisputed that Mr. Flores violated Rule 5 regarding Signing in only for oneself (Ptf Ex.1 pg 19, Co. Ex 2) is another example of this contradicting award when Mr. Flores had admitted to having a friend sign him in (Ptf Ex.1 pg 16) also by stating weather the Company had just cause to terminate Mr. Flores for the false sign-in (Ptf Ex.1 pg 17) Captain Loftus withheld Mr. Flores from service pending investigation of the false sign-in. ( Ptf Ex.1pg 17) (T. 52-53, 139; C. Ex. 7) Captain Loftus should have begun the meeting by informing Mr. Flores that his false sign-in was under investigation. (Ptf Ex.1 pg 18)  Mr. Flores stood to benefit from the false sign-in (Ptf Ex.1 pg 20) Rule 5 does not require termination under the ACP (Attendance Control Policy ) (Ptf Ex.4)

The tribunal ruled, "while the potential loss to the Company is slight and there is no evidence that Mr. Flores sought financial gain," (Ptf Ex 1) would be a complete contradiction of the tribunal award to deny the grievance termination that states, Mr. Flores stood to benefit from the false sign in (Ptf Ex.1 pg,19) but yet the tribunal still has not indicated what Mr. Flores benefited from, nor has the company indicated on the Final advisory, or prove (according to the tribunal ) that Mr. Flores benefited anything as

required to show a violation of rule 34, according to the company's own admission.

The tribunal also ruled that because Mr. Flores <u>deceived his supervisor</u>, would be another reason to deny Mr. Flores grievance. Mr. Flores made an effort to deceive his supervisor (Ptf Ex.1 pg.19) The termination reasoning stated in the arbitual tribunal was "<u>Basically tried to deceive the company.</u>" (Not his supervisor) T-62 (Loftus) Also the tribunal states that Mr. Flores did not seek to deceive crew scheduling, but instead made an effort to deceive his supervisor in order to avoid a second late report.(Ptf Ex.1) but then states Mr. Flores admitted that he asked First Officer Phan to sign-in for him (Ptf Ex.1 pg 20)

In addition to the contradicting award, this would also suggest that the tribunal ruled on a matter not submitted to them during the tribunal, (regarding Mr. Flores deceiving his supervisor ) and would also require this award to be vacated.

U.S. courts routinely refuse to enforce awards that are found to be contradictory, primarily because such awards cannot be considered "mutual, final, and definite. "92 For example, 89 *IDS Life Ins. Co. v. Royal Alliance Assocs., Inc., 266 F.3d 645, 651 (7th Cir. 2001).* 90 *Smart v. Int'l Bhd. of Elec. Workers, Local 702, 315 F.3d 721, 725 (7th Cir. 2002); IDS Life Ins. Co. v. Royal Alliance Assocs.,*

U.S. District Court for the District of Columbia held that remand is appropriate where "the award is incomplete, ambiguous, or contradictory.

*Weelde Scheepvaartkantoor B.V.,* 574 F. Supp. 367, 371 (S.D.N.Y. 1983) ("Courts will not enforce an award that is incomplete, ambiguous or contradictory."); *United Mine Workers of Am. v. Dickenson County Med. Ctr.,* No. 1:00cv00078, 2001 WL 420374, at *5 (W.D. Va. Mar. 20, 2001) ("It is well-settled that a court cannot enforce an arbitration award that is 'incomplete, ambiguous, or contradictory.'")

**D.**     **The Tribunal's Disregard To The Contractual Commuting Policy**

> **LOA 05-03 (letter of agreement) Good Faith Commuting Policy**
> **a pilot will be allowed three opportunities in a rolling 12-month period**
> **to miss a flying assignment due to commuting difficulties so long as;**
>
> **1. The pilot notifies crew scheduling four (4) hours prior to his sign-in time**
> **or after the first failed attempt at commuting, whichever occurs later: and,**
>
> **2. The pilot notifies crew scheduling after a second failed attempt at commuting;**
> **(Jt. Ex.1)**

The evidence introduced in the arbitral tribunal (Alpa Ex 6, Jt. Ex 1) shows that Mr.

Flores was is in compliance with LOA 05-03 (Jt. Ex.1) as required by him to do so.

Mr. Flores made an effort to deceive his supervisor (The Company) (Ptf Ex.1 pg 19) as

stated by Mr. Loftus that Mr. Flores tried to deceive the company. T-62 (Loftus)

Mr. Flores cannot cover up his tardiness when he notify crew scheduling, (alpa Ex

5, Co Ex 3) Crew scheduling would have entered a code, LR, meaning "late report"? That's

the normal course of business, yes. T-72 (Loftus) Mr. Flores can't deceive his supervisor

(chief pilot) when Mr. Flores has no contractual obligation to notify his supervisor for any

commuting difficulties, or any situation in which resulted in arriving late for work .

Mr. Flores cannot be faulted for complying with the term of agreement between

both parties. The company has not submitted any evidence / testimony requiring Mr. Flores

to report to his supervisor, if a pilot was running late. Nor have the company provided

any evidence to support the claims the tribunal made to deny this termination. The

Tribunal can not have it both ways. Regardless of Mr. Loftus claim, that he felt deceived

Because Mr. Flores did not tell him he was gonna be late, or Mr. Flores trying to game

the system, the misconduct in this situation only determines that the tribunal's contradicting

award, and the obligation it has to respect the terms and conditions of the contract

between both parties, *(Article 944.10(3) Code of Civil procedure, & Coderre v Coderre,)* in which resulted in an unfair and impartial arbitration hearing where the arbitrator exceeded her powers, and requires this award to be vacated, and or remanded.


### E.   The Tribunal Manifestly Disregarded the Law, "Disparate Treatment/ Retaliation."

Disparate treatment is a form of discrimination under title VII of the civil rights act. Disparate treatment occurs when a supervisor allows the majority of his / her employees to enjoy a particular job benefit but denies a single employee that same benefit. In a disparate disciplinary punishment case, "the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Ruiz v. County of Rockland, #09-0759-cv, 2010 U.S. App. Lexis 13058 (2nd Cir.).*

Mr. Flores was terminated on April 2nd 2010 for the false sign-in, in violation of rules 5, & 34, (Jt Ex.3) Mr. Flores' record was free from discipline over the two years of his employment (Ptf Ex.1 pg 21)  First officer Duc Phan was given a career decision day in violation of rules 5, & 16 (Alpa Ex.11) for his participation in the false sign-in. Mr. Phan has got a clean record previously T-23 (Co.) Phan is guilty of a Rule 16 violation for engaging in the misconduct in the first place. It was not a Rule 34 because he didn't stand to benefit in any way from what he did on behalf of his friend, the grievant. It wasn't a Rule 34 violation, in other words, that was made, T-23 (Co.) Rule 16 prohibits dishonesty when there's not -- if not involving benefit to oneself. Rule 34 goes farther and covers theft benefitting oneself. T-23 (Co.) First Officer Phan, however, erred in doing a favor for a

friend that broke a rule. That individual ultimately was not terminated, but he got as close as you can get to termination as possible without being terminated. He was given a career decision day T-23 (Co.) (Alpa Ex.11) He did not stand to benefit himself personally T-23 (Co.) he was given basically the last step before discharge, a career decision day. T-24 (Co.)

The company's own policy required the company to charge Mr. Phan with a rule 34 violation as well as Mr. Flores which states, "I understand that badging in another employee through AUTOTA or allowing another employee to badge me in is a direct vioaltion of American Eagle rule #34." (Co. Ex.6)

For the reasons stated in the arbitial tribunal award that, treating Mr. Flores and First Officer Phan the same because both participated in the false sign-in would ignore the fact that Mr. Flores determined to engaged in the false sign-in to cover up his tardiness and embroiled First Officer Phan in his misconduct. Further, Mr. Flores stood to benefit from the false sign-in while First Officer Phan did not. These distinctions between Mr. Flores and First Officer Phan undercut significantly any argument that Mr. Flores received disparate treatment when compared to First Officer Phan. (Ptf Ex.1)

The company also recognises that in the past they will give a discussion letter in a employee file if that employee was signing other employee's in for duty (Alpa Ex.8) and will also after termination, offer to reinstate another employee being terminated for multiple sign-in irregularities.

In the system board award *(Jt. Ex 2)* arbitrator, Gil Vernon, ruled that this situation is an attendance matter under company policy not a rule 34 violation, and could not prove they benefited, and reinstated both flight attendance *(Co. Ex 2)*

The company's and the tribunal belief for a false sign-in shows that it also believes that this situation is an attendance issue. As testified, before the tribunal by Captain Loftus' testimony that, a pilot who attempts to cover up or falsify an attendance issue. **T-46 (Loftus)** The issue before the Board is whether the Company had just cause to terminate Mr. Flores for the false sign-in (Ptf Ex.1 pg 17) Company has presented substantial and convincing evidence that Mr. Flores intended to falsify his sign-in. (Ptf Ex.1 pg 21) (shows rule 5 violation only and cannot be terminated under such rule.) (Ptf Ex.4) Mr. Flores maintains that he was singled out and subject to disparate treatment when he was terminated for violating Rule 34 for a sign-in irregularity. (Ptf Ex.1 Pg,16) Mr. Loftus motive to retaliate against Mr. Flores and charge Mr. Flores with a rule 34 instead of giving Mr. Flores the same discipline as Mr. Phan was because it made Mr. Loftus angry when he found out that Mr. Flores was gonna be late again after he notified crew scheduling as required by him to do so (Jt Ex.1 LOA)

Mr. Flores' conduct was no worse than First Officer Phan's and thus the tribunal distinctions of disparate treatment is not in accordance with federal law, nor should have any weight to support Mr. Flores termination. Further more Mr. Loftus retaliated against Mr. Flores and decided to charge Mr. Flores with a rule 34 only because it had made Mr. Loftus angry because Mr. Loftus found out Mr. Flores was gonna be late after he called crew scheduling on the 13th of March (Ptf Ex.2) This type of disregard, not only to the company's own disciplinary policy, (Co.Ex.6) but a manifest disregard of the law which requires a fair dealing and a prevention of any type of retaliation. This award should be vacated, or remanded for a new tribunal.

FAA caselaw also recognizes that an award may be vacated if the arbitrators act in "manifest disregard of the law." The "manifest disregard of the law" concept, while not set forth in the FAA, is widely accepted as a ground for vacating arbitration awards. The D.C. Circuit held that " to modify or vacate an award on this ground, a court must find that (1) the arbitrators knew of governing legal principle yet refused to apply it or ignored it altogether and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case."

Similarly, the U.S. District Court for the Eastern District of Pennsylvania held that "'[m]anifest disregard of the law' encompasses situations in which it is evident from the record that the arbitrator recognized the applicable law, yet chose to ignore it.

see, e.g., Brabham v. A.G. Edwards & Sons Inc., 376 F.3d 377, 381 (5th Cir. 2004) ("[M]anifest disregard is an accepted nonstatutory ground for vacatur."); Montes v. Shearson Lehman Bros., Inc., 128 F.3d 1456, 1460 (11th Cir. 1997) ("[E]very other circuit . . . has expressly recognized that 'manifest disregard of the law' is an appropriate reason to review and vacate an arbitration panel's decision.").

**F.**    **Change Of Testimony After Being Sworn Under Oath**

In the law, testimony is a form of evidence that is obtained from a witness who makes a solemn statement or declaration of fact. Testimony may be oral or written, and it is usually made by oath or affirmation under penalty of perjury.

In testimony under oath before the unemployment hearing officer, Mr Loftus (chief pilot) testified that Rule 5 was the main rule that Mr. Flores was mainly terminated for, ( Alpa Ex 3 T-17) but his testimony at the arbitral tribunal was, " Josh was gaming the system to get something for nothing. He was trying to tell the company that he was here at 2:00 to get the benefits of the pay and the per diem, and he wasn't here. And that basically is theft. It might be a small amount, but theft is theft. T-61 (Loftus) Mr. Loftus contradicted what he had testified to under oath at the unemployment hearing. (Alpa Ex.3 pg 8,9)

> *Perjury is the "willful and corrupt taking of a false oath in*
> *regard to a material matter in a judicial proceeding."*

It is important that the false statement be material to the case at hand—that it could affect the outcome of a case. It would be unlawful for the tribunal to accept any other testimony regarding Mr. Flores true reasoning for termination other then the testimony given during the unemployment hearing. This would be nothing other then the arbitrator exceeded their powers, or so imperfectly executed them, that a final, and definite award or there is an error in the form of the award, not affecting the merits; and acted in manifest disregard of the law. *(Alpa Ex.3)*

-19-

## IV.    UNDER U.S. LAW, THE AWARD SHOULD BE VACATED AND REMANDED TO A NEW TRIBUNAL

### A.    <u>Governing Law: The Federal Arbitration Act</u>

Section 10 of the FAA sets out the statutory grounds for vacating an arbitration award. At a minimum, the following grounds of the FAA are relevant here.

> (3)    Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

> (4)    Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

The statute mandates that a court "must make an order vacating the award" where "the arbitrators exceeded their powers."

The Second Circuit remanded an award to arbitration where it was found to be "contradictory on its face. The Second Circuit emphasized that "[t]he purpose of arbitration is to resolve disputes, not to create new ones[;] [and] [a]n award which does not fulfill this purpose is unacceptable. U.S. District Court for the District of Columbia held that remand is appropriate where "the award is in complete, ambiguous, or contradictory.

---

*Weelde Scheepvaartkantoor B.V.*, 574 F. Supp. 367,371 (S.D.N.Y. 1983) ("Courts will not enforce an award that is incomplete, ambiguous or contradictory."); *United Mine Workers of Am. v. Dickenson County Med. Ctr.*, No. 1:00cv00078, 2001 WL 420374, at *5 (W.D. Va. Mar. 20, 2001) ("It is well-settled that a court cannot enforce an arbitration award that is 'incomplete, ambiguous, or contradictory.'")

92 9 U.S.C. § 10(a)(4); *Sheet Metal Workers Int'l Ass'n Local Union No. 420 v. Kinney Air Conditioning Co.*, 756 F.2d 742, 745 (9th Cir. 1985) ("Courts will not enforce an award that is incomplete, ambiguous, or contradictory."); *Dworkin-Cosell Interair Courier Servs., Inc. v. Avraham*, 728 F. Supp. 156, 161-62 (S.D.N.Y. 1989) ("[I]t is well established under the [FAA] that "[c]ourts will not enforce an award that is incomplete, ambiguous or contradictory."); *Sea Dragon, Inc. v. Gebr. Van*

**B.** <u>Governing Law: Article 944.10 (3) Code Of Civil Procedure</u>

The arbitrators shall settle the dispute according to the rules of law which they consider appropriate and, where applicable, determine the amount of the damages.

> (3)     They shall in <u>all cases decide according to the stipulations of the contract</u> and take account of applicable usage.

If the collective bargaining process, is going to work effectively, faithful regard must be given to contracts and agreements. *(Article 944.10(3) Code of Civil procedure, & Coderre v Coderre,)* Regardless of the tribunal ruling, "these potential contractual violations are not sufficient to outweigh Mr. Flores conduct." **(Ptf Ex.1 pg,17 par,4.)** Procedural due process must be afforded to conduct a fair, impartial grievance process. Without this would only suggest the arbitrator exceeded her powers / authority, or so imperfectly executed them that mutual, final, and definite award upon the subject matter submitted was not made, failed to exercise honest judgment, misconduct by which the rights of any party have been prejudiced, and acted in manifest disregard of the law. The arbitrary and capricious award should be vacated.

## V.     CONCLUSION

U.S. courts have the power to remand incomplete, ambiguous, or contradictory awards. For example, the U.S. District Court for the District of Columbia held that remand is appropriate where "the award is incomplete or ambiguous.

In remanding arbitration awards, U.S. courts have the power to determine whether to remand to the original arbitrators or to new arbitrators. In considering the propriety of a district court's order remanding a dispute to a new arbitrator, the Sixth Circuit emphasized that "district courts are usually afforded broad discretion in fashioning

appropriate relief," and that discretion includes the power to appoint new arbitrators. Similarly, the Southern District of New York held that "[a]lthough not explicit in the FAA, it is within this Court's discretion to remand a matter to the same arbitration panel or a new one.

For the reasons stated above, Mr. Flores moves the Court to vacate, and or remand the Award to a new arbitral tribunal

Dated: March 04, 2011                                    Respectfully submitted,

Joshua J. Flores
650 S. Town Center Dr #1012
Las Vegas,   NV   89144
Tel: 702.743.8830
Alt: 702.869.2537

Representing: Pro se,

AI PA Ex. 1

# *PPC*

## **Peak Performance through Commitment**

## *Participant's Guide*

## AGENDA

| TOPIC | OBJECTIVE |
|---|---|
| Course Introduction | • List the course content and objectives |
| PPC Overview | • Define PPC and its uses<br>  - Discuss why PPC is important |
| The Role of Recognition/Reward | • Discuss the role of recognizing good performance<br>  - Explain why recognition of good performance is crucial<br>  - Name at least 5 ways to recognize your employees for good performance |
| Documentation | • Explain why documentation is critical<br>  - Name the components of documentation<br>  - Explain the importance of the employee signing the CR-1 entry<br>  - State how you can overcome obstacles to documentation |
| Coaching | • Demonstrate effective coaching skills<br>  - Name the 5 steps of coaching<br>  - Explain why ensuring mutual participation during coaching is critical to success<br>  - Complete a coaching session |
| Investigation | • Conduct an effective investigation<br>  - Formulate questions for effective investigations<br>  - Document an investigation<br>  - Determine an appropriate response based on the investigation |
| PPC -- The Four Advisories | • Explain how to use the PPC Advisories<br>  - When it's appropriate to issue an advisory<br>  - Discuss how to issue the 4 Advisories |
| Attendance Control Policy / Drug and Alcohol (Q&A) | • Overview AMR's Attendance Control and Drug & Alcohol policies |
| Evaluation and Close | • Evaluate the course |

# PPC OVERVIEW

## What Is PPC?

The key phrase of the PPC program is **"Catch them doing something right,"** a foundation which recognizes that most employees do (or at least try to do) a good job. PPC consists of a series of coaching and counseling sessions designed to assist employees to do their job well, to better their job performance, or to deal with the small percentage of employees who fail to respond to our attempts to assist them.

Two themes run through PPC:

- Recognizing employees who perform well and motivating them to continue their achievements.

- Coaching poor performers and assisting them in changing their performance.

## Who Does PPC Affect?

PPC involves and applies to most AMR employees. The advisory phases do not apply for those who are in the probationary period (those who are newly hired). Regular coaching and documentation does apply to all employees regardless of hire date.

## How Does PPC Work?

To administer effectively, PPC must involve continuous interaction, and communication with employees about their problems and successes. Employees' documentation records (CR-1's) should reflect all aspects of their performance, both good as well as unsatisfactory performance.

The components of PPC are:

- Emphasize the positive

- Recognize or reward good performance

- Build closer working relationships

- Exchange ideas

- Appreciate an individual's contribution to the whole

- Enhance team spirit

## PPC Foundation

One of the most common reasons for performance problems is not knowing exactly what is expected. Most others grow out of a breakdown of communication between the leader and the employee.

The key to the success of PPC is coaching employees. In other words, coaching is the foundation of most PPC actions and should be used to solve minor problems before they become major ones.

Coaching is a technique of solving performance problems to change employee behavior through face-to-face communication.

Almost all problems can be resolved by proper coaching of employees. However, a few employees may not respond to coaching at all. If an employee fails to respond to coaching, or if an employee is involved in an incident that requires immediate corrective action, the advisory phases of the PPC process begin.

## Phases

There are four advisory phases in PPC, they are:

- First Advisory

- Second Advisory

- Career Decision Day Advisory

- Final Advisory

*PPC also helps minimize the company's exposure to legal action. If PPC is not properly used to correct an employee's performance problem, the corporation may incur unnecessary legal expense if action is taken and a grievance/appeal is filed.*

## COMPARISON OF PPC AND ACP

Peak Performance Through Commitment (PPC) and Attendance Control Policy (ACP) are two different policies. Each is considered and handled separately. An employee may have both performance problems and attendance problems simultaneously. The table below shows some of the differences between the two policies.

| | PPC | ACP |
|---|---|---|
| **Application** | • Addresses all performance/ behavior issues | • Covers only attendance issues |
| **Documentation** | • CR-1 (to record both positive and constructive performance discussions) | • C21 (to record attendance, using codes such as RL, SK, PO, etc.)<br>• C23 (to record both positive and constructive attendance discussions) |
| **Corrective Action** | • First Advisory<br>• Second Advisory<br>• Career Decision Day Advisory<br>• Final Advisory | • Dr's Slip Requirement (as applicable)<br>• First Advisory (warning)<br>• Second Advisory (final warning)<br>• Final Advisory<br>**Note:**<br>NO Career Decision Day Advisory is given in ACP |
| **Order of Administration** | • Advisories can be skipped if warranted, however they are generally progressive | • Advisories must be administered in this order and cannot be skipped |
| **Requirement of Successful Change** | • Improvement as specified in coaching session, and/or<br>• Correction | • Correction of problem is the only acceptable change. Improvement is recognized and appreciated, but only correction is acceptable for an unsatisfactory attendance record. |
| **Length of Time Advisories Remain Active** | • Advisories remain active in employee's file for a max. of two years. Removal from file should be documented on CR-1. | • Advisories remain active in employee's file for a max. of two years. Removal from file should be documented on C-23. |
| **Affect on Probationary Employees** | • Probationary employees with performance problems can be dismissed without using corrective action. However, before that would occur, they should receive coaching. In all cases, document their poor performance. | • Probationary employees with attendance problems are released without using corrective action. Documentation of the poor performance is required. |

## IDEAS FOR REWARDS AND RECOGNITION

1. Up Front Parking Spot
2. Positive C & C.
3. Food items
4. Sponsored Gifts/coupons
5. Meeting w. praise in front of other employees.
6. ASK employee How to be recognized
7. _____
8. _____
9. _____
10. _____
11. _____
12. _____
13. _____
14. _____

**A'A   AMERICAN AIRLINES PERFORMANCE COUNSELING RECORD**

| EMPLOYEE NO | INITIAL | LAST NAME | ORG CODE | STA CODE | CO SENIORITY DATE | YEAR | PAGE NBR |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| DATE OF INCIDENT OR ACTION | SUBJECT OR INCIDENT DISCUSSED | DETAILS/ACTION TAKEN/COMMENDATION/OTHER REMARKS<br>BRIEFLY EXPLAIN WHAT WAS DISCUSSED/COMMITMENTS MADE<br>INCLUDE ANY SIGNIFICANT DATE/TIME/PLACE SUPERVISOR'S SIGNATURE/DATE FOLLOWING EACH ENTRY |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

AA FORM CR1

## DOCUMENTATION

It is very important that the employee's file reflect the tone of his or her entire employment history. If the employee is a typical AMR employee, his or her work will be competent ninety percent of the time. Ten percent of the time or less there will be performance mistakes. **You don't want the CR1 to contain only a record of those mistakes, and no performance history for the remaining 90%!**

The CR1 is the principle form used in PPC. Be sure to limit your entries to an objective restatement of the facts, ensure emotional or colorful language is left out (unless the employee used it). If you are angry or upset about the incident, wait until you have calmed down. The point of the CR1 entry is to have an objective recounting of the events.

There are many items needed in proper documentation. Some of the items which must be included in a CR1 entry which document a performance or behavioral problem for coaching or for an advisory are:

• The performance problem (what the behavior is, what the expectation is and how the behavior is not meeting expectations).

• The employee's view of the problem.

• The solutions agreed upon.

• The consequence of not correcting the performance problem.

A CR-1 entry does not have to be lengthy. It just needs to cover the facts and demonstrate that there was a two-way conversation. There are examples of CR1's at the back of this guide.

Request the employee sign or initial the CR1 entry to *acknowledge* that s/he has seen the entry. Note: signing or initialing the entry does not imply agreement; in fact, if the employee does not agree, the entry should indicate this. If the employee declines to sign or initial the CR1, write, "employee declined to sign CR1."

Offer the employee a copy of the discussion recorded on the CR1, but provide only the current discussion, not the entire CR1. Be sure to document that the employee received the copy of the CR-1 or declined to accept the copy.

In addition to the CR1, any time an employee is actively involved in a PPC phase other than coaching, a letter must be given informing him or her of the action. A copy of any advisory letter is to be placed in the employee's file and given to Employee Relations or Personnel (depending on the work group), where it is retained for two years. The advisory discussion is also documented on the CR1.

*If documentation does not exist, the corporation may incur unnecessary legal expense if action is taken and a grievance is filed.*

## ITEMS WHICH MUST BE INCLUDED IN DOCUMENTATION

➤ _____

➤ _____

➤ _____

➤ _____

➤ _____

➤ _____

➤ _____

➤ _____

➤ _____

➤ _____

➤ _____

➤ _____

➤ _____

## FIVE STEPS OF COACHING FOR PERFORMANCE PROBLEMS*

**STEP 1**

Get his or her agreement that a problem exists:
- Specify the behavior
- Ask open-ended questions so the employee can then see how the behavior or performance is a problem.
- Clarify consequences

**STEP 2**

Mutually discuss alternative solutions:
- Brainstorm
- React
- Expand

**STEP 3**

Mutually agree on action to be taken to solve the problem:
- Probe
- Support
- Summarize

**STEP 4**

Follow up to measure results:
- Plan
- Measure appropriate behavior

**STEP 5**

Recognize any achievement:
- Provide feedback
- Reinforce goal
- Document

## * Must be completed in this order

Source:  Fournies, Ferdinand F., *Coaching for Improved Work Performance*. Blue Ridge Summit, PA:  Liberty House, 1987.

## <u>COACHING CHECKLIST</u> -- CONDUCTING THE COACHING SESSION

<u>Before</u> beginning a coaching session, be sure to:

- ✔  Write notes and plan the coaching session (see page 16).

- ✔  Check to make sure the time is convenient for the employee.

- ✔  Arrange an appropriate place to meet.

- ✔  Inform the employee that a discussion of his or her performance is in order.  Refer to the applicable policy, procedure or union contract clause, if any.  In some cases, the employee may be entitled to have a peer witness/union representative present.  In others, you may want to have a fellow leader present (e.g., when you're going to coach on a particularly difficult situation).  If you do have another member of management present, inform the employee so that the employee has an opportunity to bring in a witness or representative.  In either case, the role of the additional people is to observe and not to act as 'attorneys'.

<u>During</u> the coaching session, follow the 5 Steps listed below:

- ✔  Get his or her agreement that a problem exists

- ✔  Mutually discuss alternative solutions

- ✔  Mutually agree on action to be taken to solve problem

- ✔  Follow up to measure results

- ✔  Recognize any achievement

<u>Close</u> the session by expressing confidence in the employee's commitment and ability to perform the job correctly.  You will also help build rapport if you thank the employee for helping to solve the problem.

<u>Follow up</u> on the coaching session by checking the employee's progress toward the goal and recognizing any improvement that is made.

# ACTIVITY -- COACHING AN EMPLOYEE

**Directions:**

**10 Minutes**                    **Individually**

1.  Determine who will be the Leader and who will be Belinda for round 1.  You will reverse roles for round 2.

2.  Read these three pieces of information to prepare for the roleplay:
    * Scenario background supplied by your facilitator
    * Roleplay Tips and Techniques on page 13
    * Form CR1 on pages 14 and 15

3.  Complete the "Coaching Worksheet -- Planning the Coaching Session", page 16, to prepare for the coaching session you will conduct when it is your turn to be the Leader.

4.  Look over the "Evaluation Worksheet" on page 17.  When it is your turn to be Belinda, provide the Leader with coaching feedback on some of these points.


**10-15 Minutes**                  **In Pairs -- Roleplay Round 1**

5.  Complete Roleplay

    * Leader coaches Belinda (10 minutes).
    * Belinda takes a moment to consider how effective the coaching session was.  Refer to the "Evaluation Worksheet" on page 17.
    * Belinda gives Leader feedback on the Leader's coaching technique (2-3 minutes).

    **Roleplay (round 1)**

    10-minute roleplay

    Belinda                    3-5 min.
                               Feedback
    
    Leader

                                                    **(Continued)**

**10-15 Minutes**          **In Pairs -- Roleplay Round 2**

6. **Complete Roleplay**

- Complete round 2 the same way you did round 1 except you reverse the roles

**Roleplay (round 2)**

10-minute roleplay

Belinda                    3-5 min.
                           Feedback
Leader

## ROLEPLAY TIPS AND TECHNIQUES

**When acting as the Leader:**

Consider how you would feel and act if this were a real situation.  In other words, think about whether the circumstances would provoke anger, hostility, frustration, or other feelings.  If so, be sure to control those feelings before beginning to discuss the situation with the employee.

**When acting as Belinda:**

Prepare to enact a scenario, acting as Belinda might act under those circumstances. Would she be:

- Angry?
- Defensive?
- Silent?
- Passive?
- Grateful for the feedback?

Plan to use at least two of these behaviors during the course of the roleplay activity.

 **AMERICAN AIRLINES PERFORMANCE COUNSELING RECORD**

| 123456 | B. | Gone | 1234 | 5678 | 12/6/93 | 1995 | 1 |
|---|---|---|---|---|---|---|---|
| EMPLOYEE NO | INITIAL | LAST NAME | ORG CODE | STA CODE | CO SENIORITY DATE | YEAR | PAGE NBF! |

| DATE OF INCIDENT OR ACTION | SUBJECT OR INCIDENT DISCUSSED | DETAILS/ACTION TAKEN/COMMENDATION/OTHER REMARKS<br><br>BRIEFLY EXPLAIN WHAT WAS DISCUSSED/COMMITMENTS MADE<br>INCLUDE ANY SIGNIFICANT DATE/TIME/PLACE SUPERVISOR'S SIGNATURE/DATE FOLLOWING EACH ENTRY |
|---|---|---|
| 2/3/95 | Orientat'n | I spoke to Belinda today welcoming her to our station.  I said she would be a great asset to our station with 2 years in Reservations.  Belinda said that she was really looking forward to working at an airport. |
| | | During this orientation, I covered the expectations of an airport agent and gave her a written copy.  I also covered the General Rules of Conduct (135-1) focusing on rules 7, 16, 25, 26, 33, 34, 35 and 36.  I gave her a copy of these; asked her to read them and to ask any questions.  She said she would. |
| | | I explained the time card procedures to Belinda.  I said that she was to sign in on her time card as though she were using a time clock, e.g., if she arrived at 07:40 for a shift that began at 08:00, she was to sign in at 07:40.  She should follow the same procedure for lunch breaks (signing out and back in) and when leaving for the day.  Belinda stated that she understood and thanked me.  I gave Belinda a copy of this CR-1. |
| | | CSTL Katie Sanford                    2/3/95 |
| 2/28/95 | Commend | I thanked Belinda for her flexibility in adapting to the off schedule operation today.  I told her I appreciated that she stayed overtime.  I also told her that other CSTL's had commented on how well she is picking up the procedures and contributing ideas in every team meeting.  I thanked her again and encouraged her to continue her efforts.  I gave Belinda a copy of the CR-1. |
| | | CSTL Katie Sanford                    2/28/95 |
| 3/8/95 | Commend | I spoke with Belinda today and showed her the list of new responsibilities the agents decided in the last team meeting to start doing.  Belinda said she would like to take over stocking forms and other supplies.  I said I appreciated her taking on that job.  I gave Belinda a copy of this CR-1. |
| | | CSTL Bridgette Sharp                    3/8/95 |
| 4/9/95 | Job Perform- ance | I spoke to Belinda today about there not being enough ticket jackets at the counter yesterday.  I asked her if she had remembered to stock the jackets.  She said that she had not and apologized, saying that she had an appointment with her former boss and |

AA FORM CR1



 **AMERICAN AIRLINES PERFORMANCE COUNSELING RECORD**

| | 1995 | 2 |
|---|---|---|
| | YEAR | PAGE NBR |

| DATE OF INCIDENT OR ACTION | SUBJECT OR INCIDENT DISCUSSED | DETAILS/ACTION TAKEN/COMMENDATION/OTHER REMARKS |
|---|---|---|
| | | **BRIEFLY EXPLAIN WHAT WAS DISCUSSED/COMMITMENTS MADE** INCLUDE ANY SIGNIFICANT DATE/TIME/PLACE SUPERVISOR'S SIGNATURE/DATE FOLLOWING EACH ENTRY |
| | | that she had CS'd off and left work early. I asked what problems might result because she did not complete her duties. Belinda said that someone else probably had to do her work. I said, "that's true", and asked what other problems might result. She said that whoever had to do her work was probably not very happy. I agreed and asked Belinda what ideas she had to avoid this in the future. She said she would make sure it didn't happen again. I asked for specific ways to ensure this. Belinda said she could use her calendar's to-do list. I agreed that might work. I thanked Belinda for coming in saying I was confident she would do fine in the future. I gave Belinda a copy of this CR-1. |
| | | Katie Sanford                        4/10/95 |
| 5/1/95 | Job Performance | I spoke to Belinda today regarding a phone call that I had received from Reservations. Belinda asked what I was talking about. I explained that I had received a call from a Supervisor in Res. stating that an agent had brought to his attention that you had called on behalf of a friend. The agent said that you had requested that they give Dr. J. Smith, an Advantage Platinum, same day service on a ticket. |
| | | I asked if she understood the policy for this, Belinda said she was not sure. I explained that the customer had to be present. |
| | | I said that it had been reported that when the Res. agent had asked to speak to Dr. Smith, Belinda had refused and had become very upset and hung up on the Res agent. The Res agent also reported receiving a call from a Dr. Smith but identified the caller as the same agent that had called from the airport. |
| | | I explained that this may be in violation of the Rules of Conduct (135-1) if there were further instances of this nature, corrective action may result. I asked Belinda if she understood, she stated that she was just trying to help a friend she used to work with. I told her that it was fine to help friends as long as no rules are violated. I also said that her conduct with Reservations was unacceptable. |
| | | She said she understood and that she would not do it again. I thanked her for her commitment. I gave Belinda a copy of this CR-1. |
| | | CSTL Katie Sanford                        5/1/95 |

FORM CR1

## COACHING WORKSHEET -- PLANNING THE COACHING SESSION

| STEP 1 | Details of what the employee did (or did not do).  Describe the behavior or performance, not the employee. |

**STEP 1**

**Get Agreement That a Problem Exists**

Details of what the employee did (or did not do).  Describe the behavior or performance, not the employee.

Details of the behavior or performance that is required.

Questions to lead to the employee's agreement that s/he has a performance problem (e.g., open-ended questions such as, "what affect do your actions have on your colleagues?, department?, customers?, company?.")

Consequences you will consider in case the employee does not agree that they have a performance problem.

**STEP 2**

**Mutually discuss solutions**

Questions to get the employee's ideas on solutions.

Your own specific ideas on solutions.

**STEP 3**

**Mutually Agree on Action Plan**

Questions to prompt employee to select solution(s).

Questions to get employee to summarize action plan.

**STEP 4**

**Follow up to Measure Results**

Statement of how and when you will follow up.

Statement to close on a positive note.

**STEP 5**

**Recognize any achievement**

How and when you will recognize improvement.

Ideas on how to reinforce the goal.

# EVALUATION WORKSHEET

**Directions:**

Consider the coaching activity.  Use the right column to record the way the coach employed the elements of coaching.  If possible, try to note the actual questions the coach used.

| Activity | Coach's Technique: |
|---|---|
| How did the coach identify the problem? | |
| How did he or she explain what the performance should have been? | |
| How did he or she get agreement on the problem?  Were consequences of no improvement stated? | |
| How were solutions generated? Mutually? | |
| How did he or she contribute possible solutions? | |
| How was a commitment asked for? | |
| How will the coach follow-up? | |

# INVESTIGATIONS

## Purpose

The purpose of an investigation is to determine the facts relevant to a suspected violation of a performance standard, policy, or procedure. These facts must be objectively, fairly and effectively investigated. These actions will help ensure the employee is treated with dignity and respect while protecting the best interests of the company.

## Overview

A fair investigation must:

- Be conducted in a timely manner

- Allow the employee to speak in his or her own behalf, where possible

- Be discreet

- Maintain confidentiality

- Honor the employee's right to union representation or other peer witness, if requested

- Include written statements by any witness

- Include accurate, complete, and unbiased notes



## FLOWCHART OF INVESTIGATIONS AND THEIR CONSEQUENCES

| | |
|---|---|
| **INCIDENT** <br><br> (Appendix pages 6 & 7) | - Attendance (ACP) <br> - Performance failures / Rule Violation (PPC) <br> - Misc. - Sexual Harassment <br>          Pass Abuse <br> ──────────────── <br> - *BOI begins here (Board of Inquiry) [1] |
| **OBTAIN INFORMATION** <br><br> (Appendix pages 8 - 13) | - Questions <br> - Witnesses (Known/Unknown) [2] <br> - Statements <br> - Evidence - Obtain and Keep <br> - Determine if drug testing and/or withhold from service is necessary <br> - Call Carrier Personnel |
| **ANALYZE** <br> (Appendix pages 14 & 15) | - Complete Investigation Worksheet <br> - Consult Carrier Personnel <br> - *BOI ends here |
| **ACTION** <br><br> (Appendix page 16) | - Select activity (coaching, CR1, advisory) <br> - Prepare to coach or draft advisory <br> - **Clear language with Carrier Personnel Department** |
| **FOLLOW UP MEETING/ DETERMINATION** <br> (Appendix page 17) | - Gather additional Information <br> - Issue corrective action [2] <br>    and/or counsel and document in CR1 <br><br> *If employee contests action, the <br>    following may happen: |
| **GRIEVANCE** <br><br> (Appendix page 18) | - Check time limits <br> - Signature of management <br> - Investigate <br> - Contact Carrier Personnel Department <br> - Answer |
| **HEARING / ARBITRATION** <br> (Appendix page 19) | |
| **OUTSIDE AGENCY / LAWSUIT** <br> (Appendix page 20) | - ADA, EEOC, DOL, Workers Comp, Negligent Hiring, Regulatory Compliance, Whistle Blower |

[1]   Only for aircraft damage, vehicle accidents, personnel injuries. Cannot result in corrective action.

[2]   Union Representative/Witness if applicable

## INVESTIGATION CHECKLIST

Some find it helpful to develop a list of questions to use as an outline for the interviews. Use these questions as a guide. Be sure to ask any additional questions which come to mind during the investigation.

### Questions...5 W's - Who, What, When, Where, Why and How

✓ What happened?

✓ Who is involved?

✓ What other facts may affect the situation?  Are there any mitigating circumstances?

✓ What witnesses exist?

✓ When did the incident occur?

✓ Where did it take place?

✓ Why did it happen?

✓ How did it happen?

### Did you...

✓ Visit the location of the incident?

✓ Collect evidence?  Secure evidence?  Remember, collect it, keep it safe, copy it and send it to Employee Relations/Personnel.  More is better!

✓ Gather written statements?  Signed and Dated with employee number?  *Very Important!* (including your own notes).

✓ Contact Corporate Security if the investigation involves contacting individuals outside of AMR (e.g., police, customers) or if there is suspicion of theft, fraud, or other activities which might be a considered a felony.

## INVESTIGATION GUIDELINES

- Call Employee Relations/Personnel if you have any questions.

- Avoid preconceived notions.  Remain objective and respectful.

- Talk to and question the witnesses **as soon as possible** following the incident.

- Try to make the employee/witness and yourself as comfortable as possible. Welcome the employee to the meeting and close by thanking him/her.  This helps overcome the natural aversion to investigations, facilitates a more relaxed atmosphere, and helps you get as much information as possible.

- Ask open-ended questions to lead you to ask follow-up questions.

- Avoid questions which suggest a reply, for instance, "You didn't see the argument, did you?"  This is a close-ended question which suggests an answer.  If the question is phrased in an open-ended style, "Tell me what you saw", the employee might answer differently.

- Allow a representative or witness to be present if one or more of the following conditions are met:
    - When more than one member of management is attending an investigation
    - When management finds it necessary to have witness(es) present during the investigation
    - When written statements from the employee are to be taken
    - When investigating any matter which may result in corrective action(s) (advisory)

- Don't be afraid to re-interview witnesses involved in the investigation to gain more knowledge or if new information comes to light.  The better your base of knowledge, the better the decision.

## AN INCIDENT

Investigations begin because an incident has occurred.  These vary from a report late (RL) to aircraft damage, theft, drug use, etc.

**Types of Investigations**

Major and Minor
There are many kinds of investigations, from the most serious type such as theft or aircraft incidents, to the minor type such as an inquiry regarding an employee's absence or the investigation of a grievance.

There are some common items which should be present in all investigations, however the degree of seriousness of the event usually correlates with the degree of detail required in the investigation.  The type of investigation you will conduct depends to a large extent on the nature of the issue under investigation.

**The most common investigation**

At AMR, we have two basic types of investigations - those which may eventuate in corrective action and those which do not.  The degrees to which these are conducted vary greatly.  The most frequent type of investigation is one in which a member of management makes legitimate inquiries of employees to determine some facts about a particular incident.  This type of investigation falls into the following areas:

- Attendance: Attendance Control Policy (ACP)

- Performance Failures and/or Rule Violations: Peak Performance through Commitment (PPC)

- Misc.: Includes Sexual Harassment and Pass Abuse

An Incident (continued)

**Board of Inquiry**

The other type of investigation is a Board of Inquiry (BOI) American Eagle Safety Manual, Chapter 2 Section 3.  This investigation is conducted when there has been a serious incident which involves aircraft damage, vehicle accidents, personnel injuries, etc.  This type of investigation is used exclusively for fact finding, and the conclusions of the Board should not be relied upon as the basis for any corrective actions.

Recommendations are made by the Board as to how future events can be prevented.  A separate investigation to determine the nature of corrective action must be conducted following the conclusion of the BOI.  The information obtained through the BOI can be referred to and relied upon during this subsequent investigation, but the recommendation for corrective action to be taken with the employee should always come from the investigation which is separate and distinct from the BOI.

**For More Info**

For more information on An Incident, see pages 6 and 7 in the Investigations Appendix.

## OBTAIN INFORMATION

**Ask Questions**
As soon as possible, the first thing you should do is question all witnesses to an incident. You can ask all kinds of questions, but be sure to include questions like these:

- Who is involved?
- What other facts or mitigating circumstances are there?
- When did the incident occur?
- Where did it take place?
- Why did it happen?
- How did it happen?

**Identify Witnesses**
Consider the seriousness of the investigation and figure out who you should interview.

**Interview Witnesses**
Sign and date your original notes to establish their authenticity. Also:
- Try to personally observe the site of the incident
- Talk to all crew members, even those not directly involved
- Talk to other employees in the area (on ramp, near gate, etc.)
- Ask questions to determine if anyone else was around

**Interview Tips**
Keep in mind that you should:
- Remain objective
- Make the witness and yourself as comfortable as possible
- Anticipate defenses which might be raised by employee or union
- Listen for both things that show guilt and substantiate <u>innocence</u>

**Right to Representa-tion**
When interviewing witnesses during the investigation the employee may be entitled to have a union representative/peer witness present during questioning. For example, if one of these conditions is met:
- When more than one member of management is attending an investigation
- When management finds it necessary to have witnesses present during the investigation
- When written statements from the employee are to be taken
- When investigating any matter which may eventuate in corrective action(s) (Advisory)

<u>Obtain Information</u> (continued)

**Written
Statements**
Two important points to remember about written statements:
- Make sure the written statements are signed and dated
- If an employee refuses to provide a written statement you may be required to provide a *directive*.

**Obtaining &
Securing
Evidence**
Many arbitration cases have been lost because the supervisor failed to collect and save the evidence. Therefore, take steps to preserve your work and the evidence you develop. Keep these points in mind:
- Secure evidence in a locked place with limited/controlled access
- If possible, mark the evidence for future identification
- Remember, you might want to fingerprint evidence later
- When dealing with contraband, contact local authorities

**Remember**
Keep these simple points in mind...
- Collect it
- Keep it safe
- Copy it
- Send it to Personnel...MORE IS BETTER!!

**For More
Info**
For more information on <u>Obtain Information</u>, see pages 8 - 13 in the *Investigations Appendix.*

## ANALYZE

After interviewing witnesses and obtaining physical evidence, complete the following:

- Chronologically reconstruct what happened.

- Look for gaps, contradictions or incomplete information in sequence. Determine if clearing these up is critical to the investigation. If critical, go back and ask some additional questions to fill in the blanks.

- Analyze the contradictions and gaps. Look at each discrepancy and ask:
    - Why don't they know this?
    - What do the others say about this?
    - Why are these two statements in conflict?
    - Why does this not reflect the same thing as the physical evidence?

- Divide the contradictions into two groups:
    - Major contradictions
        - Relate directly to an element of the charge which needs to be proved before corrective action is deemed appropriate (e.g., in a theft case, an employee first said he never saw the stolen tool; later says he took it home to fix it).
            - These contradictions involve a fact in the case that is so important, the likelihood of an honest mistake or misperception-perception is diminished.
            - Major contradictions need to be identified so they can be investigated further. Sometimes there is a perfectly logical reason why someone seems to give a different response to what appears is the same question.

    - Minor contradictions concern facts that do not involve an element of the charge, but may be relevant to a person's credibility (e.g., the employee first said he used the tool to fix a seat in coach, and later said he used it to fix an overhead bin).

**For More Info**    For more information on Analyze, see pages 14 and 15 in the *Investigations Appendix.*

## ACTION

Before determining what action, if any, will be taken, it is important to review the employee's personnel file for previous corrective action and/or counseling. Be prepared to discuss any prior action with Personnel or Employee Relations.

- Review employee's personnel file.

- Contact Employee Relations or Personnel to:
  - Discuss the company's past practices or the contractual interpretation of an issue.
  - Discuss the information which has been gathered. Determine any missing information and consider the appropriate actions to take.

- Decide on appropriate action.
  - Draft related documents (e.g., advisory letters).
  - Consult with ER or Personnel to confirm language in the letter.

- Meet with employee to follow-up.

- Document investigation and/or advisory issued in the CR-1.

### Withholding from Service

The purpose of withholding an employee is to protect the company, fellow employees, passengers and operations from potential risks that may come from allowing the employee to remain at work while a matter is under investigation. It is not discipline, but rather a preemptive or protective measure taken before assessing corrective action.

Generally, an employee may be withheld in the following situations:

1. When the employee under investigation poses a potential immediate **threat to AMR employees, passengers or operations** (e.g., some employee altercations (Rule 31, 32) or insubordination -- e.g., refusal to perform job (Rule 7)).

2. When the charge being investigated, if proven, could result in **termination. These are theft/serious criminal charges (Rule 34), failure to cooperate with an investigation, or violations of the drug or alcohol policies (Rules 25, 26, or 33).

<u>Action</u> (continued)

**Note:** If withholding seems appropriate in any other situation, or for cases involving off-duty criminal offenses, contact Personnel/Employee Relations before withholding.

Employees are withheld from service <u>with pay unless</u>:

- They are charged with a criminal offense.

- They refuse to cooperate in an investigation.

**For More Info**

For more information on <u>Action</u>, see pages 16 in the *Investigations Appendix*.

════════════════════════════════════

**Other Appendix Topics**

For more information on these topics, see the following pages in the *Investigations Appendix*:

<u>Follow-up Meeting/Determination</u>:  page 17

<u>Grievance</u>:  page 18

<u>Hearing/Arbitration</u>:  page 19

<u>Outside Agency/Lawsuit</u>:  page 20

## INFORMATION TO HAVE BEFORE CONTACTING
## PERSONNEL/ EMPLOYEE RELATIONS

| Peak Performance (PPC) | Attendance Control (ACP) |
|---|---|
| ✓ Employee name/number | ✓ Employee name/number |
| ✓ Title/position; length of service with the Company | ✓ Title/position; length of service with the Company |
| ✓ Date of incident | ✓ Time frame being considered (e.g., 12 months, 18 months, etc.) |
| ✓ Description of incident | ✓ Date of last ACP action |
| ✓ List of witnesses/written statements | ✓ List of the lost time occurrence dates / amount of sick time in bank |
| ✓ Review of employee file--previous corrective action/performance counseling:<br>- What level of action?<br>- When was it issued/documented?<br>- What station/team leader? | ✓ Nature of absence (e.g., SK, RL, etc.)<br><br>✓ Reason provided by employee<br><br>✓ Who discussed the absence with the employee |
| ✓ Possible rule violations | ✓ Date of the discussion |
| ✓ Withhold from service or not | ✓ Recommendation for action and why |
| ✓ Mitigating circumstances/union perspective | ✓ Possible questions ER/Personnel may ask:<br>- Has employee been referred to EAP?<br>- Has the employee been seen by Medical?<br>- Did the employee see a doctor?<br>- If yes, did he/she get a note from the doctor?<br>- Has s/he seen any other doctors?<br>- Is there an indication of an underlying health problem? |
| ✓ Recommendation for action and why | |

# ACTIVITY -- INVESTIGATION PROCEDURES

**Directions:**                    **As a Group**

1.    Read the scenario provided by your facilitator.

2.    As a group, develop questions based on the "Fact Finding Checklist" (page 31) which will enable you to conduct an investigation.

3.    Allow 3 - 5 minutes to complete the investigation for each of the parties involved (there are 3 roles/volunteers).

4.    Prepare to discuss your findings and the use of the checklist.

## FACT FINDING CHECKLIST

**Questions...5 W's – Who, What, When, Where, Why and How**

✓  What happened?

✓  Who is involved?

✓  What other facts may affect the situation?  Are there any mitigating circumstances?

✓  When did the incident occur?

✓  Where did it take place?

✓  Why did it happen?

✓  What witnesses exist?

✓  How did it happen?

# ACTIVITY: ADVISORY PHASES

The goal of this activity is to give you the opportunity to discuss the advisory phases with your peers.

**10 Minutes**

### In Four Groups

- Meet in your assigned group and discuss your assigned advisory phase:

  - First Advisory              Pages 33-34
  - Second Advisory          Pages 35-36
  - Career Decision Day Advisory  Pages 37-39
  - Final Advisory             Pages 40-42

- Prepare a 5 minute presentation for the rest of the class explaining your assigned advisory.
  - Be sure to cover:
    - Goal of the advisory
    - When to issue an advisory
    - How to issue an advisory
    - Next steps
  - Use flipchart and markers to show your information
  - Note:  During the presentation, please ask questions if something is unclear to you.

- Select a scribe and a spokesperson from your group.

**5 Minutes per Advisory**   **As a Group**

- Listen to the other presentations and ask questions if you need further clarification.



# FIRST ADVISORY

## Goal

The goal of the First Advisory, as throughout PPC, is to provide the employee with an opportunity to correct a problem, and prevent it from escalating to a higher level.

## When to Use a First Advisory

Keep in mind that a First Advisory is necessary for the employee who does not respond to coaching, or for one whose behavior or performance problem is serious enough to justify beginning the formal corrective part of the PPC process at a level higher than coaching.

## How to Issue a First Advisory

Every situation is different. This process will provide you with a foundation to follow. Use these basic steps along with the additional information specific to each advisory to complete the advisory process. Remember, if in doubt, or if you have questions, contact Personnel or Employee Relations.

Prior to Issue:

1. Complete research and investigation into the performance problem.

2. Prior to coaching the employee, contact Employee Relations or Personnel for advice.

3. Prepare for your coaching session with the employee. Write notes and consider the questions you will ask (refer to Coaching Worksheet, page 16).

4. Conduct the coaching session. Allow representation if applicable and requested. Document the coaching session on the CR-1.

5. Decide if an advisory is warranted.

6. Prepare an Advisory letter. Contact ER or Personnel to approve the language of the letter and the decision to issue.

**How to Issue a First Advisory** (continued)

**When Issuing:**

7. Schedule a meeting with the employee to advise the employee of your decision. Allow peer witness/union representation to be present, if applicable.

8. Give the letter to the employee and a copy to ER/Personnel. Place one copy of the letter in the employee's file. Document issuance of the advisory on the CR-1.

### Next Steps

9. Follow through to ensure the agreed action has taken place. Provide feedback to recognize correction. Document this in the employee's CR-1.

10. Remove the advisory after two years. Document the removal.

## SECOND ADVISORY

### Goal

The Second Advisory is the phase when you make it clear to the employee that termination of employment is a possibility unless performance standards are met. The goal is to ensure that the employee understands correction of the problem must occur.

### When to Use a Second Advisory

Keep in mind that a Second Advisory is necessary for the employee who does not respond to both coaching and the First Advisory, or who has a very serious performance problem.

### How to Issue a Second Advisory

Every situation is different. This process will provide you with a foundation to follow. Use these basic steps along with the additional information specific to each advisory to complete the advisory process. Remember, if in doubt, or if you have questions, contact Personnel or Employee Relations.

Prior to issue:

1. Complete research and investigation into the performance problem.

2. Prior to coaching the employee, contact Employee Relations or Personnel for advice.

3. Prepare for your coaching session with the employee. Write notes and consider the questions you will ask (refer to Coaching Worksheet, page 16).

4. Conduct the coaching session. Allow representation if applicable and requested. Document the coaching session on the CR-1.

5. Decide if an advisory is warranted.

6. Prepare an Advisory letter. Contact ER or Personnel to approve the language of the letter and the decision to issue.

**How to Issue a Second Advisory** (continued)

**When Issuing:**

7.  Schedule a meeting with the employee to advise the employee of your decision. Allow peer witness/union representation to be present, if applicable.

8.  Give the letter to the employee and a copy to ER/Personnel. Place one copy of the letter in the employee's file. <u>Document issuance</u> of the advisory on the CR-1.

**Next Steps**

9.  Follow through to ensure the agreed action has taken place. Provide feedback to recognize correction. <u>Document</u> this in the employee's CR-1.

10. Remove the advisory after two years. <u>Document the removal.</u>

# CAREER DECISION DAY ADVISORY

## Goal:

The goal of the Career Decision Day Advisory is to give the employee an opportunity to carefully consider his/her continued employment with the Company.  At this point, you have concluded that the employee's behavior/performance warrants termination.

The employee is given a chance to provide a written commitment to correct all aspects of his/her performance.  This allows the employee an opportunity to evaluate his or her personal standards and a final chance to turn failure into success.

In this advisory procedure, as in the other advisories and all other work interactions, it's important to treat the employee fairly; and with dignity and respect.

The employee is given three options to consider on the Career Decision Day Advisory:

| | | |
|---|---|---|
| Option 1 | Sign a company prepared letter of commitment to correct the problem and meet company standards in order to continue employment with AMR Corporation. |
| Option 2 | Resign and agree, in writing, not to exercise grievance rights or bring actions against the company.  In doing so, the employee will retain some temporary benefits. |
| Option 3 | Decline options 1 and 2, and be terminated with the option to file a grievance. |

## When to Use It?      :

The Career Decision Day Advisory offers the employee the final opportunity to commit to correct performance or behavioral problems.  The opportunity comes in the form of a day off with pay to consider his or her future and continued employment with the Company.  Use the Career Decision Day Advisory only if the employee's performance or behavior warrants immediate termination and yet you believe there is the possibility the employee can correct the problem.  However, if the employee has violated certain rules (e.g., #25, 26, 33, and 34), immediate termination is warranted and no Career Decision Day Advisory can be given.

## How to Issue a Career Decision Day Advisory

Every situation is different. This process will provide you with a foundation to follow. Use these basic steps along with the additional information specific to each advisory to complete the advisory process. Remember, if in doubt, or if you have questions, contact Personnel or Employee Relations.

### Prior to Issue:

1. Complete research and investigation into the performance problem.

2. Prior to coaching the employee, contact Employee Relations or Personnel for advice.

3. Prepare for your coaching session with the employee. Write notes and consider the questions you will ask (refer to Coaching Worksheet, page 16).

4. Conduct the coaching session. Allow representation if applicable and requested. Document the coaching session on the CR-1.

5. Decide if an advisory is warranted.

6. Prepare an Advisory letter. Contact ER or Personnel to approve the language of the letter and the decision to issue.

### When Issuing:

7. Schedule a meeting with the employee to advise the employee of your decision. Allow peer witness/ union representation to be present, if applicable.

8. Give the letter to the employee and a copy to ER/Personnel. Place one copy of the letter in the employee's file. Document issuance of the advisory on the CR-1.

### Next Steps

9. Follow through to ensure the agreed action has taken place. Provide feedback to recognize correction. Document this in the employee's CR-1.

10. Remove the advisory after two years. Document the removal.

## SECTION 3

### Step 6: Grievances

**Grievance**

If you receive a grievance, you must first sign and date the form to establish the time and date of receipt. It is important that you respond to all grievances, whether or not the employee's filing was timely, within the prescribed time limits of the applicable labor agreement or the Employee Handbook.

**Contact the Carrier Personnel Department**

If a grievance is filed, Personnel provides support at the various levels of the grievance procedure, including the suggested language to use in the grievance answer.

Personnel's role during the grievance process is to provide you guidance in answering the grievance that is consistent with the Company's past practice. This is to avoid setting dangerous precedents that would be harmful to the Company's overall interests.

Corporate Training & Development
Investigations Training Appendix

5/3/96
9:55 AM

Appendix
Page 18

**Special Notes on How to Issue a Career Decision Day Advisory**

- Ensure the Career Decision Advisory Day letter lists the three options and attach a copy of the company-prepared letter of commitment.

- Make sure the employee receives the letter at the beginning or middle of the work day; not the end.

- Code the employee's Career Decision Day as "CD" to ensure the employee is paid for the day.

- Emphasize to the employee that the Advisory and the three choices be considered very carefully. Insist that the day away from work be taken. Do not accept a Letter of Commitment that day (the employee could later say that the letter was signed under duress). Suggest the employee talk the choices over with family members, friends or trusted advisors. Arrange a specific time (generally 24 hours later) to meet again to hear of the employee's choice.

- Note: if the employee fails or refuses to elect an option, the employee has elected termination by default. Indicate this in the CR-1. Mail a Final Advisory to the employee using a certified letter.

- After two years, remove the advisory and the letter of commitment from the file. Document the removal.

## FINAL ADVISORY

### Goal:

The goal of this Advisory is to terminate the employee. The employee will be given a letter explaining that he or she is being terminated from employment with AMR Corporation, and the reason(s) why.

### When to Use It?

When an employee has been through the entire PPC process, or has violated one of the rules which justifies immediate termination, it is time to issue the Final Advisory.

There are basic rules which are grounds for immediate dismissal if violated.

- Rule #25 and #26, pertaining to the use of alcohol.

- Rule #33, concerning drugs.

- Rule #34, regarding dishonesty on or off the job. (The employee will be held out of service until the allegations are proven or disproven.)

Additionally, other rule violations may result in immediate termination. According to page 13 of the PPC Supervisor's Handbook:

Other incidents and offenses, insubordination, aircraft damage, and job actions, for example, could be grounds for immediate termination depending on the severity of the incident or offense, and the employee's record. In such cases, when immediate termination may be appropriate but additional information is needed, the employee may be withheld from service while you conduct the investigation.

Every situation is unique and therefore a leader must exercise judgment in dealing with a particular problem. The procedures outlined here are generally applicable, but the leader retains the authority and the responsibility for dealing with specific problems in specific ways dictated by the circumstances of the case. Deviations from these procedures, however, should be reviewed with the appropriate Employee Relations/Personnel Office prior to taking any action.

**Note:  Special Language to Use in Cases of Insubordination**

Before an employee can be terminated for insubordination, you <u>must</u> use all four components of the following dialogue.

1. "If you do not follow instruction/directives you will be considered insubordinate.  I am giving you a directive to _____.  Do you understand?"

2. "Failure to follow my directive will be considered insubordination, which is a violation of the General Rules of Conduct.  Insubordination could lead to corrective action, up to and including termination."

3. "Do you understand what I have just said?"
   - If employee says 'no', restate the consequences of failing to follow the directive.

4. "I will restate my directive again" (restate the directive).

## How to Issue a Final Advisory

**Prior to Issue**

1. Consult your Employee Relations or Personnel Office prior to taking any action. In addition, ask about the legal requirements the company has to provide the employee upon termination (e. g., the final pay check).

2. Conduct all necessary meetings. Document meetings on the employee's CR-1. Allow representation if applicable and requested.

3. Prepare a Final Advisory letter.

4. Schedule a final session.


**When Issuing**

5. Conduct the session. Document it on the CR-1.

6. Explain to the employee his or her right to continued health insurance coverage under COBRA (Continuation Of Benefits Reimbursement Act). Note: all employees are eligible for COBRA coverage except those terminated for violation of rule # 33. Complete all necessary paperwork for the COBRA coverage.

7. Secure all keys, security badges, travel cards, access cards, and I.D.'s. Do **NOT** destroy these items. This will ensure, that in the event the dismissal is reversed, the employee is able to be productive immediately upon return to work rather than waiting for new badges/cards to be produced. Instead, put the items in a secure, locked location. Consult your Employee Relations or Personnel office for further guidance on their disposal or recycling.

8. Document issuance of the advisory on the employee's CR-1.

# WRITING AN ADVISORY LETTER

## Heading

The date, employee's name and number, and the advisory step.

## First Paragraph(s)

Provide a specific description of the performance or conduct problem which has triggered the issuance of the advisory letter.

## Second Paragraph

Indicate which rule(s) (if applicable) were violated by the behavior or performance problem. Include the text of the rule.

## Third Paragraph

Summarize any discussions you have had with the employee about the incident or problem area, pertinent information from the employee's performance record, and any previous corrective action the employee has received.

## Fourth Paragraph

Explain the consequences of the employee's failure to correct the problem and ask the employee to 'commit' to correcting his/her performance. It can use language such as: "I urge you to make a make a commitment, through this document, to correct your performance and to comply with all other company rules and regulations since failure to do so could result in further corrective action."

## Signatures and Copies

Sign the letter. Indicate where copies will be sent (e.g., cc: file, Personnel, Manager, etc.)

# ATTENDANCE CONTROL POLICY

## Purpose

The Attendance Control Policy exists to help ensure all functions are staffed to enable the operation and office to run effectively. The company counts on employees being in attendance at work at the assigned time. However, if lateness or absence is unavoidable, the employee must call to report as far in advance as possible to allow other arrangements to be made. If employees are ill, the company provides Sick Leave Benefit to offset the costs of being sick.

## Lost Time

Lost Time is the way the company accounts for the costs associated with Sick Leave Benefit. Lost time consists of Sick Pay, salary continuance for Injury On Duty and sick time due to pregnancy. In 1993, the company spent $93 million in Lost Time alone; in 1994 it was $110 million. And in 1995 it was $121 million! This does not include the costs associated with overtime or extended hours necessary to cover for the absent employee or with administrating the policy.

Much of the cost associated with Lost Time is controllable. Nothing is more effective in reducing absenteeism than leaders who:

- Communicate the Company's policies

- Keep good records

- Maintain consistent follow-up

### Actions Which Minimize Lost Time:

- Thoroughly know the content of the company's Attendance Policy and Sick Leave Benefit.

- Make certain that all employees reporting to you are aware of their obligations under these policies. It's best to have a discussion of the policies soon after they start their new jobs (e.g., on the first day in an orientation session with you).

- Maintain, day-by-day, the attendance records of your employees on a C-21 (see Tab 4 for a sample C-21). This way, anyone reviewing the record can make a reasonable determination concerning the employee's attendance and continue with appropriate action.

- Frequently review these records, look for patterns which may indicate a recurring problem (e.g., frequently ill on Mondays or Fridays).

- Acknowledge every absence, regardless of the employee's attendance record. Speak to the employee on the employee's first day back to work. Reinforce the need for good attendance. Make appropriate notes of all discussions, however brief, with the employee concerning his or her attendance including the reason for each absence. Record these notes on the C-23. Be sure to have reviewed the employee's record to see if there's an indication that the attendance record is developing into an unsatisfactory one. Note: it's not necessary for the employee to sign the C-23.

- Commend employees whose attendance is satisfactory, encouraging them to maintain that satisfactory record.

- Counsel with and, as required, warn the employee whose attendance is unsatisfactory.

- Terminate the employee whose attendance continues to be unsatisfactory.

Attendance Control Policy (continued)

## Paid Sick Time

- Paid sick time is a company-provided monetary benefit.  It is intended to protect employees from the financial consequences of being ill.

- Paid sick time can be thought of as an "insurance policy."  It pays employees a full salary when they are truly disabled and unable to work.  It is not a means of gaining an additional vacation day.  The best way to protect one's salary during serious illness is with a maximum sick bank.

- Sick Pay is not for self-induced illness, doctor's appointments, elective medical treatment, or when a dependent is ill.

## Documenting Attendance

- All employees attendance records are documented on the C-21 using codes such as HO, VC, RL, SK, etc.

- Some locations use AUTOTA to complete this activity.  Contact Personnel Planning ([ICS] 963-5944) for more information on Attendance or Payroll ([ICS] 254-3411) for information on AUTOTA.

## ACP Advisories

Three advisory phases are used for attendance control.  They are similar to the PPC advisories in that they are very serious, stay active for two years, and are issued in a similar manner.  But they differ from PPC advisories in two ways:

- The only acceptable remedy to an attendance problem is *correction*.  Improvement is recognized and appreciated, but only correction is acceptable for an unsatisfactory attendance record.

- There is no "Career Decision Day Advisory" in ACP.  The advisories are:
    - Doctor's slip requirement, where applicable
    - First Advisory (warning)
    - Second Advisory (final warning)
    - Final Advisory

- Refer to the table, "Comparison of PPC and ACP" on page 49 to see more about the two policies.

Attendance Control Policy (continued)

### How to Address an Attendance Problem

Preparing for ACP Coaching And Counseling Session:

1. Review records on the C-21 and look for patterns, frequency and history

2. Review previous discussions on the C-23. Look for history of problems and their remedies.

Conducting the ACP Coaching And Counseling Session:

3. Discuss company policies.

4. State the problem and need for correction. Be sure to use proper terminology:
   - *"Correct"* rather than "improve"
   - *"Unsatisfactory"* attendance record rather than "poor"

   Note: If you SUSPECT an employee may be abusing the sick leave benefit (or suspect that the employee may not be using the sick leave benefit for the intended purpose), you are REQUIRED to take appropriate action under ACP.

   - Advise the employee (at this point in the conversation) saying the following:
     - "You are suspected of sick leave abuse."
     - You will need to provide a doctor's slip each time there is an absence. The employee will need to continue this practice for 90 days (or 6 months for Flight Attendants).

5. Ask for commitment to correction. During the discussion, be sure to maintain control and focus on the employee's record.

Following the ACP Coaching And Counseling Session:

6. Document the discussion on the employee's C-23.

7. Follow through to ensure the agreed action has taken place. Provide feedback to recognize correction. Document this in the employee's C-23.

C-23

## COMPARISON OF PPC AND ACP

Peak Performance Through Commitment (PPC) and Attendance Control Policy (ACP) are two different policies. Each is considered and handled separately. An employee may have both performance problems and attendance problems simultaneously. The table below shows some of the differences between the two policies.

| | PPC | ACP |
|---|---|---|
| **Application** | • Addresses all performance/behavior issues | • Covers only attendance issues |
| **Documentation** | • CR-1 (to record <u>both</u> positive and constructive performance discussions) | • C21 (to record attendance, using codes such as RL, SK, PO, etc.)<br>• C23 (to record <u>both</u> positive and constructive attendance discussions) |
| **Corrective Action** | • First Advisory<br>• Second Advisory<br>• Career Decision Day Advisory<br>• Final Advisory | • Dr's Slip Requirement (as applicable)<br>• First Advisory (warning)<br>• Second Advisory (final warning)<br>• Final Advisory<br>Note:<br>NO Career Decision Day Advisory is given in ACP |
| **Order of Administration** | • Advisories can be skipped if warranted, however they are generally progressive | • Advisories must be administered in this order and cannot be skipped |
| **Requirement of Successful Change** | • Improvement as specified in coaching session, and/or<br>• Correction | • <u>Correction</u> of problem is the only acceptable change. Improvement is recognized and appreciated, but only correction is acceptable for an unsatisfactory attendance record. |
| **Length of Time Advisories Remain Active** | • Advisories remain active in employee's file for a max. of two years. Removal from file should be documented on CR-1. | • Advisories remain active in employee's file for a max. of two years. Removal from file should be documented on C-23. |
| **Affect on Probationary Employees** | • Probationary employees with performance problems can be dismissed without using corrective action. However, before that would occur, they should receive coaching. In all cases, document their poor performance. | • Probationary employees with attendance problems are released without using corrective action. Documentation of the poor performance is required. |

## Drug and Alcohol Policy of AMR EAGLE

Company chairman Robert Crandall stated the company policy unequivocally when he said:

> "American Airlines is absolutely committed to maintaining a safe and healthy workplace. An important part of that commitment is doing all that we can to rid our company of drugs . . . I think it is clear that any employee who uses drugs or abuses alcohol jeopardizes those objectives."

Federal law requires drug and alcohol testing of certain employee groups. This law is supported by company policy, which also requires all employees to submit to drug and alcohol testing before hiring can be completed, as well as under some other circumstances.

Rules #25, 26, and 33 of the AMR Regulations forbid the use of or impairment by, drugs and/or alcohol. Violation of #26 or #33 is grounds for immediate dismissal. If an employee has a breath alcohol content of .04 or greater, he/she is also subject to immediate dismissal for violation of Rule #25. If the breath alcohol content is greater that .02 but less than .04, the employee is issued a final warning under the Drug and Alcohol Policy.

In effect, Federal law requires airline Team Leaders, managers and other leaders to enforce the law.

Drug and alcohol abuse has many negative consequences for passenger safety and company profitability. Among them are:

- Increased use of sick leave

- Increased numbers of RL's (report lates)

- Increased risk of on the job accidents

Refusal to submit to drug testing when directed to do so is grounds for immediate dismissal.

Employee Relations has a class on Drug and Alcohol Policy. For more information, contact [ICS] 967-9286 or your local ER representative.

# INVESTIGATIONS

## Appendix

Corporate Training & Development
Investigations Training Appendix

5/3/96.
9:45 AM

Appendix
Page 1

# Preface/Introduction

Whether you are a brand new Supervisor, or a veteran 20 year Manager, from time to time you are confronted with situations which you must investigate. Almost without exception, all these investigations will be unique. There may be some similarity to other investigations you have conducted in the past, but no two are ever exactly alike.

Because of the unique nature of investigations there is no "text book" method or "fill in the blanks" form that can be used as a guideline. By their very nature, investigations require a lot of on the spot thinking to obtain the most reliable and relevant information possible for use as the basis for a sound conclusion.

If you are fortunate, you will not have to get involved in a lot of investigations during your career. Unfortunately, this infrequent participation in investigations has a tendency to reduce an individuals *investigative effectiveness*. Conducting effective investigations is a skill that can be practiced and learned. Just like algebra or chemistry, you can learn a lot, but if you do not use the knowledge often you can become rusty in that skill.

We have designed this course to give both the novice and the veteran an opportunity to review some of the skills needed to conduct an effective investigation. By reviewing these skills, we hope that you will see improved results in the outcome of your investigations. To this end we have provided you with this handbook, which we hope will become a ready reference for you when you have occasion to conduct an investigation. We welcome any comments or suggestions you may have to improve this tool.

# TABLE OF CONTENTS

| SECTION | Section Topic | Page |
|---------|---------------|------|
| SECTION 1 | Introduction to the Investigations Process | 4 |
| SECTION 2 | Investigations | 6 |
| SECTION 3 | Grievances / Arbitrations | 18 |
| SECTION 4 | Guidelines on Common Questions | 21 |
| | Checklists / Worksheet | 35 |
| | Terms | 40 |

Corporate Training & Development
Investigations Training Appendix

5/3/96
9:45 AM

Appendix
Page 3

## SECTION 1

## INTRODUCTION TO THE INVESTIGATION PROCESS

**What is an Investigation?**

Basic to employee/employer relationship is the right of management to make reasonable inquiries of employees. This right is a basic tenet which has not been limited or restricted by the labor agreements that American Eagle has entered into with the Unions on the property.

**How does the Carrier Personnel Department fit in?**

The Personnel Department is a support unit. Our primary role is to provide guidance to management before, during, and after an investigation to be sure that the actions taken can be upheld. If you have questions regarding any of these, we can provide advice. You can also refer to the focus record (F*EMP) for detailed information regarding the Attendance Control Policy, Peak Performance through Commitment and the Drug and Alcohol Policy.

Corporate Training & Development
Investigations Training Appendix

5/3/96
9:45 AM

Appendix
Page 4

# FLOWCHART OF INVESTIGATIONS AND THEIR CONSEQUENCES

| | |
|---|---|
| **INCIDENT**<br><br>(Appendix pages 6 & 7) | -   Attendance (ACP)<br>-   Performance failures / Rule Violation (PPC)<br>-   Misc. -   Sexual Harassment<br>                    Pass Abuse<br>-----------------------------<br>-   *BOI begins here (Board of Inquiry) [1] |
| **OBTAIN INFORMATION**<br><br>(Appendix pages 8 - 13) | -   Questions<br>-   Witnesses (Known/Unknown) [2]<br>-   Statements<br>-   Evidence - Obtain and Keep<br>-   Determine if drug testing and/or withhold from service is necessary<br>-   Call Carrier Personnel |
| **ANALYZE**<br>(Appendix pages 14 & 15) | -   Complete Investigation Worksheet<br>-   Consult Carrier Personnel<br>-   *BOI ends here |
| **ACTION**<br><br>(Appendix page 16) | -   Select activity (coaching, CR1, advisory)<br>-   Prepare to coach or draft advisory<br>-   Clear language with Carrier Personnel Department |
| **FOLLOW UP MEETING/ DETERMINATION**<br>(Appendix page 17) | -   Gather additional information<br>-   Issue corrective action [2]<br>    and/or counsel and document in CR1<br><br>*If employee contests action, the following may happen: |
| **GRIEVANCE**<br><br>(Appendix page 18) | -   Check time limits<br>-   Signature of management<br>-   Investigate<br>-   Contact Carrier Personnel Department<br>-   Answer |
| **HEARING / ARBITRATION**<br>(Appendix page 19) | |
| **OUTSIDE AGENCY / LAWSUIT**<br>(Appendix page 20) | -   ADA, EEOC, DOL, Workers Comp, Negligent Hiring, Regulatory Compliance, Whistle Blower |

[1]   Only for aircraft damage, vehicle accidents, personnel injuries.  Cannot result in corrective action.

[2]   Union Representative/Witness if applicable

## SECTION 2

### Step 1: An Incident

**An Incident**   Investigations begin because an incident has occurred.  These vary from a report late (RL) to aircraft damage, theft, drug use, etc.

**Types of Investigations**   Major and Minor
There are many kinds of investigations, from the most serious type such as theft or aircraft incidents, to the minor type such as an inquiry regarding an employee's absence or the investigation of a grievance. There are some common items which should be present in all investigations, however the degree of seriousness of the event usually correlates with the degree of detail required in the investigation. The type of investigation you will conduct depends to a large extent on the nature of the issue under investigation.

**The most common investigation**   At AMR, we have two basic types of investigations - those which may eventuate in corrective action and those which do not.  The degrees to which these are conducted vary greatly.  The most frequent type of investigation is one in which a member of management makes legitimate inquiries of employees to determine some facts about a particular incident.  This type of investigation falls into the following areas:

- Attendance: Attendance Control Policy (ACP)

- Performance Failures and/or Rule Violations: Peak Performance through Commitment (PPC)

- Misc.: Includes Sexual Harassment and Pass Abuse

**Step 1:  An Incident** (continued)

**Board of**
**Inquiry**

The other type of investigation is a Board of Inquiry (BOI) American Eagle Safety Manual, Chapter 2 Section 3.   This investigation is conducted when there has been a serious incident which involves aircraft damage, vehicle accidents, personnel injuries, etc.  This type of investigation is used <u>exclusively for fact finding</u>, and the conclusions of the Board should not be relied upon as the basis for any corrective actions.

Recommendations are made by the Board as to how future events can be prevented.  A separate investigation to determine the nature of corrective action must be conducted following the conclusion of the BOI.  The information obtained through the BOI can be referred to and relied upon during this subsequent investigation, but the recommendation for corrective action to be taken with the employee should always come from the investigation which is separate and distinct from the BOI.

## Step 2: Obtaining Information

**Ask Questions**

The first thing you want to do in an investigation is to question *as soon as possible* all witnesses to the incident. Some find it helpful to develop a list of questions to use as an outline for the interviews. This can help to insure that you ask all of the important questions of each possible witness, however, it can also hinder you as there may be a tendency to ask only those question on the list, ignoring some obvious questions that should normally be asked during an inquiry. When developing such list, keep in mind that open ended questions are more effective than questions that can be answered with a "yes" or "no".

**What do you ask?**

When formulating those questions, remember to ask the 5 W's: Who, What, When, Where, Why and How.

- Who is involved?

- What other facts may affect the situation? Are there any mitigating circumstances?

- When did the incident occur?

- Where did it take place?

- Why did it happen?

- How did it happen?

**Identify witnesses**

The next step is to identify the witnesses and determine who is involved. In the most serious of investigations, you should plan to speak with anyone and everyone who may have some knowledge of the event. In minor situations, you may only wish to speak to the principles and those who are identified during the investigation as having knowledge of the event. The nature of the event and the projected possible outcome will help you to determine the extent of your investigation.

**Step 2:** Obtaining Information (continued)

**Other tips**

During the investigation try to **remain objective**. Do not start out with a preconceived notion of what happened.

There is a natural aversion to participation in an investigation. You need to be aware of this and try to make the witness (and yourself) as comfortable as possible with the process. You want to get as much information as possible and a relaxed atmosphere is much more conducive to this end.

Do not ask closed ended questions or questions which suggest a reply. You want to learn about what happened, and that may be the best place to start. "Tell us about what happened" is an open question that should lead you to ask some follow up questions. Refrain from using questions such as "You didn't see the accident, did you?" This closed ended question suggests an answer which the employee might have answered differently in his/her own words. If the employee is going too fast, ask specific questions about different points to insure that you have the complete picture.

Try to visualize what the employee is explaining. If the picture you see is incomplete, ask further questions to fill in the blanks.

Also, try to anticipate possible defenses which may be raised by the employee or the union. Look at each defense critically to determine if there are gaps or inconsistencies and ask questions which will help you confirm or refute the defense.

The burden of proof is on the Company, therefore be careful to listen both for the things that prove guilt and the things that will substantiate innocence.

Be thorough and learn as much as you need to learn about the event - too much is better than too little.

**Step 2: Obtaining Information** (continued)

**Interview witnesses**

After you have identified the witnesses and thought about how you will proceed, interview each witness to learn from them the extent of their knowledge of the event. Ask open ended questions and take good notes. Notes will be a tremendous help for you if you are ever called upon to recount what happened during your investigation.

*Sign and date your original notes to establish their authenticity!*

In the more serious investigations, you might consider a "scribe" who will be responsible for taking all official notes. Remember, it is your time, it is your investigation. Take as long as you need to insure that you have as complete of an understanding as needed depending on the nature of the event.

You are trying to gain an understanding which is as complete as possible of the events that took place, even though you were not there to see it. Your objective is to reconstruct to the extent possible, all the circumstances of the event so that you know better than any one individual involved, exactly what happened. This is accomplished through questioning witnesses about their knowledge, and then taking the information they provided along with everything else you have learned about the event, to ask further questions.

When possible it is advisable to personally observe the site of the incident. Sometimes this could lead to the discovery of witnesses that are not obvious to the situation, i.e., vendors or non-employees that may have been present and observed the incident. Some witnesses are not obvious and you must be as thorough as possible in order to identify them. Therefore:

- talk to all crew members, even those not directly involved

- talk to other employees in the area (on ramp, near gate, etc.)

- ask questions to determine if anyone else was around

Listen carefully to the witnesses. They can sometimes say some extraordinary things that will be very helpful in gaining an understanding, but you won't get that understanding if you don't listen. Also, pay careful attention to the things that witnesses do not say. Sometimes you may find deliberate omissions that require further probing for additional information.

**Step 2:** Obtaining Information (continued)

**Employee
Right to
Representation**
When interviewing witnesses during the investigation the employee may be entitled to have a union representative/peer witness present during the questioning. Some labor contracts set out general conditions where the employee has a "contractual right" to have a representative from the union present. Under contracts with specific representational rights if any one of the following conditions are met, the employee has a right to representation/witness. However, this does not apply to investigations by Security.

- When more than one member of management is attending an investigation

- When management finds it necessary to have witnesses present during the investigation

- When written statements from the employee are to be taken

- When investigating any matter which may eventuate in corrective actions (Advisory)

These conditions are good guidelines to follow under contracts that do not specify representational rights; however, we have no obligation to allow representation.

Even though there are specific conditions defined for an employees' right to representation, these conditions do not help to define what is, and what is not an investigation. In fact, any time you seek to obtain additional information upon which you will make a decision, you are conducting an investigation. The degree of scrutiny and amount of detail required depends on the issue at hand, and the employee's right to representation depends on your assessment of the projected outcome.

There may be occasions where none of the above conditions for representation/witness exist, yet the employee is asking that a representative/witness be present. Although not required, the supervisor *may* allow the presence of a representative/witness if requested. The denial of this type of request may only act as an impediment to your efforts to understand whatever event you are inquiring about, and allowing a representative/witness to be present should not change the manner in which we do our business. We should say the same things and ask the same questions with or without the representative/witness.

Step 2: Obtaining Information (continued)

**Written statements**

Written statements from each witness confirm the verbal statements they have made to you, and also provide a historical record of what they have said. This may not seem important, particularly in the case of a witness who says that he/she did not see a thing, but recollections can change over time. Sometimes, witnesses who claim that they did not see a thing, later have remarkable recall in arbitration. This is much less likely to occur if there is a written statement that says "I didn't see a thing"!

*Make sure that the written statements are signed and dated.* Also, don't be afraid to ask for more detail in the statement, particularly if they have failed to include something they have stated verbally.

If you encounter a situation where an employee refuses to provide the requested written statement, it may be necessary for you to give the employee a directive. If you give a directive, it is imperative that the employee understand he/she is being *directed* to comply with the request and that his/her failure to cooperate *will* result in his/her being considered insubordinate (Rule 7 violation) and may result in discharge.

There may be times when the employee is unable to provide the written statement and it may be permissible to have a statement dictated and signed by the employee or your written notes may be offered to the employee and his/her signature would indicate that your notes reflect what has been verbally stated.

**Obtaining and securing evidence**

Imperative to your investigation is the collection and preservation of evidence. Many arbitration cases have been lost because the supervisor failed to collect and save the evidence. Therefore, take steps to preserve your work and the evidence you develop.

Any physical evidence taken from the scene should be kept in a secure, locked placed with limited/controlled access. If possible, mark the evidence for future identification. Be mindful that in some cases, you might want to fingerprint the evidence later. Therefore, handle documents/evidence with care (e.g., for a locker search, get a bag and gloves to handle the evidence)

When dealing with contraband, contact local authorities. Also, in cases of physical injury, accidents or when perishable items are involved, it can be beneficial to take pictures.

**Step 2: Obtaining Information** (continued)

**Remember**
- Collect it
- Keep it safe
- Copy it
- Send it to Personnel...MORE IS BETTER!!

**Summary**
Throughout the entire process of obtaining the information, be mindful of the potential outcome of your investigation. You might be dealing with a situation where the range of possibility runs from a CR-1 entry to termination. The outcome will depend on the facts you develop during your investigation. You can advise the employee of the range of possibilities but don't offer amnesty to individuals who cooperate and don't make commitments you may not be able to keep.

*Along the same lines, don't tell employees you will terminate or issue an advisory until the investigation is complete and the decision has been made.*

## CALL THE CARRIER PERSONNEL DEPARTMENT

Your local Personnel office should act as a resource for you during any investigation. If you would like to discuss the method to follow in your investigation, Personnel can help. Although they are not able to give you questions to cover every possible scenario, they can assist you in identifying areas in which to conduct your inquiry.

## REMINDER

If the investigation includes employees from more than one department, the action should be coordinated between departments.

Be sure the employee has the opportunity to provide you with additional information. When concluding the meeting with the employee, inform employee to contact the supervisor with additional information.

**Step 3: Analyze**

**Analyze**

Once you have interviewed all the witnesses and obtained all the physical evidence, you should be able to chronologically reconstruct what happened. This should be done using the information provided. Analyze the evidence you have obtained. And that means analyze the contradictions and gaps.

You will find in many cases that the reconstructed sequence of events is incomplete or contains contradictions. Identify these and determine if clearing these up is critical to your investigation. If the missing information is indeed critical, go back and ask some additional questions to fill in the blanks.

Analyze the contradictions and gaps you identified. You should look at each discrepancy and ask yourself: Why don't they know this?, What do the others say about this?, Why are these two statements in conflict?, Why does this not reflect the same thing as the physical evidence? You can reach some conclusions based on the information you already have. Once again, try to determine if the missing information or the contradiction is relevant to your investigation.

You should divide the contradictions into two groups: major and minor. Major contradictions go directly to an element of the charge you need to prove before corrective action is appropriate. These contradictions involve a fact in the case that is so important, the likelihood of an honest mistake or misperception is diminished. Minor contradictions concern facts that do not involve an element of the charge, but may be relevant to a person's credibility.

For example, if an employee in a theft case tells you he never saw the stolen tool but admits in a subsequent meeting that he took the tool home to repair it, that contradiction is major. One element of a theft charge is that the employee "took" the stolen item. So the employee's initial denial of any connection with the tool is a major contradiction.

On the other hand, if he tells you he was using the tool to repair a seat in coach and in a subsequent investigation says he used it to repair the overhead bin, that is a minor contradiction. This minor contradiction is important to note for credibility purposes. In fact, minor contradictions may raise further suspicion of a major contradiction, such as the denial of any connection with the tool. However the seat/overhead contradiction alone does not suggest theft, while the initial denial of any connection with the tool may.

Step 3: <u>Analyze</u> (continued)

Major contradictions need to be identified because you often have to do further investigation on them. Sometimes there is a perfectly logical reason why someone seems to give a different response to what you think is the same question. And you should always remember that most people have never been involved in an investigation, so the employee will probably be nervous.

Don't be afraid to re-interview witnesses involved in the investigation to gain more knowledge or if new information comes to light. The better your base of knowledge, the better the decision that will come from it.

**Review employee's personnel file**

Before determining what action, if any, will be taken, it is important to review the employee's personnel file for previous corrective action and/or counseling. Be prepared to discuss any prior action with Personnel.

**Contact the Carrier Personnel Department**

At this point you should contact Personnel. Personnel can provide you information on the Company's past practice or on the contractual interpretation of an issue.

This is also an important time to discuss what information has been gathered so far and what, if any, more information is needed and what steps to take next. At this time you might also want to discuss what level of action you believe is appropriate given all the facts. Attached in Tab 5 is the information that Personnel will need when you call.

Additionally, Personnel can help you with unanticipated questions or situations. See Tab 4 for answers to these and other common questions.

- Is drug testing needed?

- Should I withhold from service?

- Can I do a locker search? A tool box search?

- How do I deal with an unruly union rep?

- Are personal attorneys or family members allowed?

- What should I do when the employee will not cooperate?

## Step 4: Action

**Action**

Once you have analyzed the situation and reviewed all of your evidence, you should determine what action will be taken. The worksheet will help you in this analysis and in possible future testimony.

**Role of Carrier Personnel**

If your conclusion is that an advisory is warranted, you should draft the language of the advisory and then EMail or fax it to Personnel for approval. *Under both the PPC and Attendance Control policies, it is required that Personnel review the action and approve the language prior to issuance.*

Personnel provides a check and balance, but the responsibility for a proper investigation and the subsequent action, is yours. You work with the employee therefore, you may accept our recommendations or choose not to follow our advice. (However, if there is a Rule 25, 26, 33 or 34 violation involved, the recommendations of Personnel *must* be followed). If you choose some other course of action, we will represent that decision as the Company's position if it ends in a hearing/arbitration. Since we are more familiar with that arena, we believe that our advice will increase your odds of being successful in a hearing/arbitration.

If the situation results in a hearing/arbitration, we will be there to prepare you to testify as well as to present your decision in the best light possible in order to sustain the action taken.

*When you understand the importance of conducting a thorough investigation and you apply those concepts, you will increase your odds of winning. This is important because the cost associated with each step is increasingly more expensive to the Company.*

Corporate Training & Development
Investigations Training Appendix

5/3/96
9:55 AM

Appendix
Page 16

## Step 5: Follow-up Meeting/Determination

Once you have reviewed the investigation with Personnel, you will schedule a meeting for the purpose of concluding the investigation. At this point, you may be documenting on a CR1, issuing an advisory, or possibly taking termination action. Or you may conclude that no action at all is necessary.

Once again, the employee may be entitled to representation/witness. It is important that prior to issuing advisory action, you once again ask the employee if there is **anything** more that the employee needs us to know. Absent any additional information, you would advise the employee of the forthcoming advisory or issue it depending on the circumstances at the time.

In the case of a termination, you must collect all Company property if you have not already done so.

*In the case of advisory action, it is extremely important that you document the facts pertaining to and the issuance of the advisory in the employee's CR1 record / C23. Also, send a copy of the signed advisory to Personnel.*

If the employee is a non-management salaried (NMS) employee, it is appropriate to advise the employee of his/her right to file a grievance.

## Step 7: Arbitration/Hearing

**What is it?**   An Arbitration/Hearing is a procedure governed by the applicable labor agreement or the Employee Handbook by which Company actions or procedures are reviewed by a third party. Both the Company and the employee/union present arguments and evidence to support their positions. If a grievance you have received goes to arbitration, you will probably have to testify to demonstrate the correctness of your actions. A more detailed explanation will be offered during witness preparation by the individual(s) who will be assisting in the presentation of the case.

**Burden of proof**   In cases involving corrective action (advisories, discharges), the burden of proof belongs to the Company. This is where the thoroughness of the investigation becomes critical.

The employee is **"innocent until proven guilty"** which is why the Company has the Burden of Proof. Management has made the allegation and must demonstrate the validity of the allegation.

In cases of contract interpretation, the burden of proof belongs to the union. The union has claimed the violation and the burden of proving the violation rests with the Union.

**Purpose of cross examination**   The importance of a thorough investigation is most evident during the cross examination phase or arbitration where the opposing party tries to discredit you and find the holes in the Company's case. These holes are generally related to the failure to do a thorough investigation.

The opposing side will attempt to show the following:

A. Incomplete investigation

B. Bias/disparate treatment

C. Cast doubt on truthfulness of the witnesses

D. Question witness competence

E. Show failure to follow the Company procedure or violation of labor contract

F. Failure to maintain evidence

**Step 8:  <u>Outside Agency/Lawsuit</u>**

**A final note**   Although labor arbitrations are final and binding on both parties because they are covered under the Railway Labor Act, there are other types of charges that can be filed against the Company by covered and non-covered employees as a result of the actions that you take.  Some examples include:

- ADA

- EEOC

- Worker's Compensation

- Wrongful Discharge

- Regulatory Compliance

- Negligent Hiring

- DOL

As an incident moves through the investigation, grievance and arbitration process, the costs to the Corporation increase substantially. Additionally, the costs associated with outside claims usually escalate dramatically.

As you are conducting your investigation and answering grievances, you should be aware that your actions may be subject to a high degree of scrutiny by outside agencies.

# SECTION 4: GUIDELINES

| Guideleines On: | Page |
|---|---|
| Withholding | 22 |
| Employee Right to Representation/Witness | 25 |
| Insubordination | 28 |
| Fighting | 30 |
| Search of Lockers/Personal belongings | 31 |
| Sexual Harassment | 32 |
| Alcohol/Drug Testing | 33 |

## _WITHHOLD GUIDELINES_

**Why withhold**

The purpose of withholding an employee is to protect the Company, fellow employees, passengers and operations from potential risks that may come from allowing the employee in question to remain at work while a matter is under investigation. Withholding is not discipline, but rather a preemptive or protective measure which is taken before assessing corrective action.

**When do you withhold**

Withhold employees only when necessary. Generally, an employee may be withheld in the following situations:

1. When the employee under investigation poses a potential immediate **THREAT TO AMERICAN EAGLE'S EMPLOYEES, PASSENGERS OR OPERATIONS.** Examples: some employee altercations (Rule 31, 32); insubordination (refusal to perform job) (Rule 7);

2. When the charge being investigated, if proven, could result in **TERMINATION.** These are theft/serious criminal charges (Rule 34), failure to cooperate with an investigation (Rule 7) or violations of the drug or alcohol policies (Rules 25, 26 or 33).

3. When a flight crew member is needed for **IMMEDIATE QUESTIONING** and a trip is imminent. Examples: in a serious matter where we want to limit the opportunity for the employee to create a defense; situations involving outside authorities, such as Port Authority Police, FAA, etc.;

## IF WITHHOLDING SEEMS APPROPRIATE IN ANY OTHER SITUATION, OR FOR CASES INVOLVING OFF-DUTY CRIMINAL OFFENSES, CONTACT CARRIER PERSONNEL BEFORE WITHHOLDING

## WITHHOLD PROCEDURES

**Written notice**

1. **Written Notice** (On Company letterhead if possible), should be handed to the employee or sent to his/her home, certified mail, return receipt requested. A copy should be placed in his/her personnel file and a copy should be retained by you for your records. Written withhold notice should include the appointed date and time for future contact.

**Secure ID, keys, etc.**

2. **Secure** the employee's ID card/Security badge, any keys assigned, travel authorization card (including spouse) and parking lot cards.

**Contact Carrier Personnel**

3. **Contact local Personnel** as soon as possible to inform them of the pending investigation.

## PAY STATUS

The following lists are examples of when the withhold is with or without pay. These lists are not exhaustive. Please consult Personnel for the pay status of withholds for any other reason:

| WITH PAY | WITHOUT PAY |
|---|---|
| Altercation with a customer or another employee | Action constituting a criminal offense (on or off-duty). Consult with Personnel in all cases. |
| Reasonable suspicion drug/alcohol test pending test results | Verified positive drug or confirmed positive alcohol test from the date on letter of verification / confirmation |
| Insubordination | Failure to cooperate with an investigation |
| Aircraft damage | Refusal or adulteration of drug test |
| Theft | |
| Other serious misconduct | |

## Example of Withhold Notice

You are held out of service (with/without) pay commencing (time and date) pending investigation.

You are instructed to report to (Name and title) at (time) on (date) to discuss the results of this investigation.

(With Pay)  Should you fail to report at the appointed date and time, you will be placed in a non-pay status.

Your failure to appear may be considered insubordination, which in and of itself, will be grounds for dismissal.

*When you give the employee the withhold notice, you should have the employee fill out his/her current address and phone number in case you need to contact him/her.*

## EMPLOYEE RIGHT TO REPRESENTATION GUIDELINES

When interviewing witnesses during the investigation the employee may be entitled to have a union representative/peer witness present during the questioning. Some labor contracts set out general conditions where the employee has a "contractual right" to have a representative from the union present. Under contracts with specific representational rights if any one of the following conditions are met, the employee has a right to representation/witness. However, this does not apply to investigations by apply to investigations by security.

- When more than one member of management is attending an investigation

- When management finds it necessary to have witnesses present during the investigation

- When written statements from the employee are to be taken

- When investigating any matter which may eventuate in corrective actions (Advisory)

These conditions are good guidelines to follow under contracts that do not specify representational rights; however, we have no obligation to allow representation.

Even though there are specific conditions defined for an employees' right to representation, these conditions do not help to define what is, and what is not an investigation. In fact, any time you seek to obtain additional information upon which you will make a decision, you are conducting an investigation. The degree of scrutiny and amount of detail required depends on the issue at hand, and the employees right to representation depends on your assessment of the projected outcome.

There may be occasions where none of the above conditions for representation/witness exist, yet the employee is asking that a representative/witness be present. Although not required, the supervisor *may* allow the presence of a representative/witness if requested. The denial of this type of request may only act as an impediment to your efforts to understand whatever event you are inquiring about, and allowing a representative/witness to be present should not change the manner in which we do our business. We should say the same things and ask the same questions with or without the representative/witness.

**Unruly Rep / Peer Witness**   In the event the union representative/witness is unruly or disruptive, stop the hearing and instruct the representative/witness that he/she is not allowed to interfere with the investigation.   Sometimes it is beneficial to take the representative/witness out of the room for this discussion.

The representative/witness is not there to answer questions on behalf of the employee.  He/she may ask questions to clarify the situation but he/she is not there to cross examine the supervisor.  He/she is there to ensure that the Company is not violating the rights of the individual.

**Number of Reps that can attend**   Only *one* Union Rep or peer witness may attend.

**Personal Attorneys/ Family Friends**   Personal attorneys, family or friends are not allowed to be the representative/witness.

Also, a union employee can only have a union representative present. They may not have a peer witness.

**Request for specific Rep**   If the representative is on duty or reasonably available, then the supervisor should try to accommodate the request.  However, if the specific union rep is not available, then the employee should get an available union rep.  The supervisor should not tell the employee who can/cannot be their union rep.

**How long to wait for a Union Rep?**   A standard of reasonableness should apply.  The particular facts and circumstances of your investigation might dictate that you proceed immediately, without the Union's presence, as in the case of an employee observed showing the signs.  The supervisor should use good judgment and discretion.

**Rep for probationary employees**

For purposes of union representation and filing of grievances, a probationary employee has all the rights and privileges of a regular employee with one exception:

> The Company may release a probationary employee without cause and without a hearing.

In all other circumstances, a probationary employee may file and have a grievance heard on any issue other than termination. However, make sure you retain all records since the employee may pursue court action against the Company.

In summary, if management elects to hold a meeting to discuss potential discharge with a probationary employee, that employee would be entitled to union representation, upon request, but would subsequently not be entitled to a hearing and/or representation should management ultimately decide to terminate that employee.

**Use of Videos or Tape Recorders**

Neither the Company nor the employee can record the meeting, unless both parties agree to a transcript of the meeting. The purpose of the investigator meeting is to obtain as much information about the incident as possible. If someone is recording the meeting, it sets a bad tone for the meeting and inhibits individuals from openly discussing the event.

**Discussions with no Rep**

There are many times when you will have discussions with employees when there is no need for a union representative/peer witness. However, there might be times when the employee says something that could result in corrective action (e.g., the employee starts telling you about a fishing trip when you realize that the employee had called in sick on those days). At this time you should tell the employee that in light of new information this discussion could lead to corrective action and that he/she has the right for a union rep/peer witness.

Corporate Training & Development
Investigations Training Appendix

5/3/96
9:48 AM

Appendix
Page 27

AIPA EX. 3

STATE OF ILLINOIS
DEPARTMENT OF EMPLOYMENT SECURITY
APPEALS DIVISION
BENEFIT APPEALS SUBDIVISION

|  |  |
|---|---|
| JOSHUA J. FLORES | ) |
| CLAIMANT | ) |
|  | ) |
| AMERICAN EAGLE AIRLINES | ) |
| EMPLOYER | ) |

HEARING TRANSCRIPT
DOCKET NO. 0037169A

HEARING DATE:  June 24, 2010
TIME:  12:00 p.m.
LOCATION:  (telephone hearing)
REFEREE:  John Schellenberg

PARTICIPANTS

Claimant:  Joshua J. Flores

Employer:  Frank Loftus, Employer Witness

Proceedings

1

2  REFEREE:   The Docket Number is 0037169A.   I'm gonna call the case

3  for hearing.

4  (PERIOD OF SILENCE ON RECORDING)

5  RECORDING:   You are the first to join your conference.   You are

6  joining your conference at the host.   Should you need assistance

7  during the conference, press # then zero.   (DIALING)   Press 1.

8  (DIALING)   Please enter 1 plus the area code and phone number for

9  the first location, wait…

10  (PERIOD OF SILENCE ON RECORDING)

11  RECORDING:   … join your conference.   You are joining your conference

12  at the host.   Should you need assistance during the conference,

13  press # then zero.   (DIALING)   Please enter 1 plus the area code and

14  phone number for the first location, wait for your party to enter,

15  then press # to add the location to your conference.

16  (DIALING/RINGING)

17  CL:  Hello?

18  R:   Yes, hello.   This is John Schellenberg with the Illinois

19  Department of Employment Security, trying to reach Joshua Flores,

20  please?

21  CL:  Yes, this is.

22  R:   Okay.   I was calling about your hearing and we're…

23  CL:  Uh huh.

24  R:   We're gonna start that in just a minute, so please hold on the

25  phone, okay?

26  CL:   Okay.   I don't… I don't, uh… I just uh… I only have maybe…

27  maybe ten minutes.   So if we can, uh… I… I'm at a… a conference

1   trying to get a job thing here, so.

2   R:  Okay.  Well, I don't think we'll probably get the hearing done

3   in ten minutes.

4   CL:  Um… okay, we'll let's… let's… let's go and we'll try to get as

5   much done as possible.

6   R:  Alright.  Okay.  I'll get back on in just a second.  Thank

7   you.

8   CL:  Okay.

9   (DIALING)

10  RECORDING:  The location…

11  (DIALING)

12  R:  (WHISPERING)(INAUDIBLE)

13  (RINGING)

14  LOFTUS:  Flight Department, Frank speaking.

15  R:  Yes, this is John Schellenberg with the Illinois Department of

16  Employment Security.

17  LOFTUS:  Hey, John.

18  R:  How are you today?

19  LOFTUS:  Excellent.

20  R:  Good.  Calling about our hearing for Mr. Flores.

21  LOFTUS:  That's correct.

22  R:  And, uh, he's on the other line.

23  LOFTUS:  Okay.

24  R:  And he just told me he's got a limited amount of time, so I

25  might speak faster to try to accommodate, but at any rate, I assume

26  you're ready, so if that's the case…

27  LOFTUS:  I… yeah, I just… uh, I'm in my office.  Just let me shut my

1  door and pick up the phone and then I'll be ready, okay?

2  R:  Alright.  Thanks.  I'm gonna get us switched in.

3  (DIALING)

4  RECORDING:  The location… (DIALING)

5  R:  Okay.  Mr. Flores, you still there?

6  CL:  Yeah.  Yes.

7  R:  And we're waiting for the Employer to get back on and then we'll

8  start here.

9  LOFTUS:  Okay, I'm ready.

10  R:  Alright.  We'll go ahead and start.  This is hearing before the

11  Illinois Department of Employment Security, Docket 0037169A, June

12  the 24th, 2010.  It's 12:06 p.m. central time.  Appearing by phone is

13  the Claimant and I have your address and Social Security Number on

14  the notice.  I assume all that was correct as… uh, as it was on

15  there, right?

16  CL:  Um…

17  R:  Mr. Flores?

18  CL:  Yeah, it's changed.  Uh, I have a different address, but I

19  updated already, 605, so that's the address you should have.

20  R:  Okay.  Let me find that.

21  CL:  Or 650, I'm sorry.

22  R:  Yes, I got it.  650 Town… it says Town something.  Town Center

23  Drive.

24  CL:  Yeah, Town… uh, yeah.  It's Town… Town Center.  Yeah, that's

25  correct.

26  R:  Okay.  Uh, and do I have your consent to record your voice for

27  the hearing?

1   CL:  Yeah, sure, go ahead.

2   R:  Will there be anyone else besides yourself for the hearing?

3   CL:  No.  Nope, just me.

4   R:  The Employer is American Airlines.   Appearing on behalf of the

5   Employer is Frank Loftus.   Sir, did I…

6   LOFTUS:  That's right.   And it's American Eagle Airlines, it's not

7   American Airlines.

8   R:  Okay.  Do I have your consent to record your voice for the

9   hearing, sir?

10  LOFTUS:  Sure.

11  R:  Anyone else besides yourself for the Employer for the hear-

12  ing?

13  LOFTUS:  Nope.

14  R:  I show this is the Claimant's appeal of a decision dated May

15  the 4th.   It said that the Claimant, uh, was discharged from

16  American Eagle Airlines, Inc. because of falsification of time

17  card, instructing a coworker to sign him in.   He was late, but

18  wanted to be signed in on time.   And then it recites, "The Claimant

19  is ineligible from April 4th through April 17th and will be

20  ineligible as long as he meets the requirements of the Act."

21  And that is the decision that you wanted to appeal, is that

22  correct?

23  CL:  Yes, that's correct.

24  R:  Mr. Flores?

25  CL:  That's correct.

26  R:  Okay.  So I have three issues for the hearing.   The first on is,

27  was there a timely protest?   The second issue is was there a timely

1   appeal?  The third issue is whether the Claimant was dismissed and,

2   if so, whether that was for misconduct at work.  Do we understand

3   the issues for the hearing, Mr. Flores?

4   CL:  Yes, sir.

5   R:  Do you understand the issues, Mr. Loftus?

6   LOFTUS:  Uh, yes.

7   R:  I have an Employer protest in the file and I'll mark it

8   as Exhibit 1.  I show this as, um, faxed in April the 27th.

9   Any objections to that to show the date that was filed, Mr.

10  Flores?

11  CL:  What day was that?

12  R:  April the 27th.

13  CL:  Yeah.  Yeah, whatever the date was for unemployment.  Yeah,

14  that's fine.

15  R:  Any objections, Mr. Loftus?

16  LOFTUS:  No.

17  R:  I then have the appeal letter and that'll be Exhibit 2.  This

18  was due June 3rd and I have it faxed in May the 27th.  I assume you

19  don't object to that, correct, Mr. Flores?

20  CL:  Correct.

21  R:  Any objection to that to show the date filed, Mr. Loftus?

22  LOFTUS:  No.

23  R:  Okay.  This will be the procedure for the rest of the hearing.

24  I'm gonna ask questions of the Employer first.  When I'm done, I'll

25  give him an opportunity to add additional evidence.  When that's

26  done, I'll give the Claimant an opportunity to ask him additional

27  questions.  We'll then flip the case around.  I'll ask questions of

1   the Claimant, I'll give him a chance to add evidence and then I'll

2   give the Employer an opportunity to ask him some… ask him some

3   questions. And then at the end of the hearing I'll give both sides

4   another opportunity to offer rebuttal evidence and to make

5   concluding remarks for the record. Any questions about those

6   procedures, Mr. Flores?

7   CL: No.

8   R: Any questions about that, Mr. Loftus?

9   LOFTUS: No.

10  R: I'd like you both to please raise your right hand. I do

11  solemnly swear that the testimony I'm about to give is the truth,

12  the whole truth and nothing but the truth. Is that your oath, Mr.

13  Flores?

14  CL: Yes.

15  R: Is that your oath, Mr. Loftus?

16  LOFTUS: Yes.

17  R: Mr. Loftus, what's your job there?

18  LOFTUS: I'm the Chief Pilot for American Eagle Airlines in

19  Chicago.

20  R: What was Mr. Flores' job?

21  LOFTUS: He was a First Officer in the Canada Air Regional Jet, the

22  CRJ, based in Chicago O'Hare.

23  R: Would you happen to know a rate of pay offhand or no?

24  LOFTUS: Uh, no.

25  R: How about a date of hire for him?

26  LOFTUS: Okay, let's see here. Hey, Josh, what's your employee

27  number?

1   CL:   Uh, 651188.

2   LOFTUS:   Uh, I show 17 March of '08.

3   R:   And the last day of work?

4   LOFTUS:   Uh, stand by.  Uh… he was released on, uh, 2 April.

5   R:   And was dismissed, right?

6   LOFTUS:   That is correct.

7   R:   Was that your decision?

8   LOFTUS:   Yes, it was.

9   R:   What was the reason for that?

10  LOFTUS:   Uh, basically violation of, uh, company rules and I do have

11  some documents that I would like to be entered into the record,

12  which should have been forwarded to you.

13  R:   Okay.  I'll look at those in a minute.  Uh, what was the reason

14  though?  You're saying he was…

15  LOFTUS:   Okay.   Well, basically, Josh was, uh, lives in the Las

16  Vegas area.  He was commuting to work as many pilots do.

17  R:   Yeah.

18  LOFTUS:   And he asked one of his friends to sign him in the computer

19  to indicate to the company that he was actually here in Chicago when

20  he wasn't.

21  R:   That's the main reason he was discharged, right?

22  LOFTUS:   Yes.

23  R:   And is there a rule or policy that would apply to that?

24  LOFTUS:   Uh, there seems to be some type of background noise.   Could

25  you repeat the question?

26  R:   Is there a rule or policy that would apply to that behavior?

27  LOFTUS:   Ye… yes, there is.

1   R:  Okay.  What's that?  Is that like a falsification policy?

2   LOFTUS:  Yes.  Yeah.  It would be actually, uh, a violation of, uh,

3   Rule No. 5 at American Eagle, which is check on or off duty in the

4   prescribed manner and for yourself only is the actual rule.

5   R:  I see that.  That's the one you faxed me here.

6   LOFTUS:  That's correct.

7   R:  I'll mark that as Exhibit… it's called Rules of Conduct.  I'll

8   mark it as Exhibit No. 3.  Any objections to that, Mr. Flores?

9   CL:  Uh… no, there's no objection to that Rule 5.

10  R:  Okay.  Do you also have a falsification, rule or no, Mr.

11  Loftus?

12  LOFTUS:  Uh, I believe, uh, he was also dismissed for, uh, Rule 34,

13  which is dishonesty of, uh, any kind in rela… in, uh, relation… or…

14  I can't really read this that well.

15  R:  Okay.  So Rules 5 and 34.

16  LOFTUS:  Uh… and 34.

17  R:  Okay.

18  LOFTUS:  Right.  Which you should have a copy of.

19  R:  That's the same thing I just marked as Exhibit 3, so…

20  LOFTUS:  Oh.

21  R:  Okay.  Those are the main two rules, right?

22  LOFTUS:  That is correct.

23  R:  And in… would… I assume he would have received a copy?

24  LOFTUS:  Uh, yes.

25  R:  I think I have a… a… an acknowledgement showing receipt, so I'll

26  mark that…

27  LOFTUS:  That is correct.  And…

1  R:  … as Exhibit 4.  Any objections to that, Mr. Flores?

2  CL:  Uh, yes, I do object to, uh, Rule 34.

3  R:  Well, I was just actually putting the rules in to show what they

4  stated, not to show that you violated them.  I… I…

5  CL:  Oh, yeah, yeah.  That… yeah, yeah.  I… I… I agree to, uh, what

6  Mr. Loftus stated…

7  R:  Okay.

8  CL:  … what Rule 34 was.

9  R:  And then I just put it in here that you received it as Exhibit

10  4.  They have an acknowledgment that you received the rules and I

11  assume you don't object to that.  Mr… Mr…

12  CL:  Uh…

13  R:  That's what I'm asking now.

14  CL:  That… that… that I received what?

15  R:  A copy of their policies.

16  CL:  I did receive the copy of that policy on the day of my

17  termination on my… in departure.

18  R:  Okay.  Uh… had Mr. Flores ever been warned in the past about

19  violating Rule 5 or 34 or any similar rule, Mr. Loftus?

20  LOFTUS:  Uh, the week prior to the event, uh, uh… well, Rule 5 I

21  would say no.  Uh, the week prior to the event, uh, Josh was late

22  for work.  Same situation, (inaudible) work and he was late and he

23  was warned about, you know, getting here on time.  But as far as

24  like having someone else sign him in, I do not believe so.

25  R:  Okay.  So prior warnings for tardiness issues, but not for these

26  issues.

27  LOFTUS:  Right, not… not for… I… I… I can't say truthfully whether

1   they've happened in the past or not and I haven't caught him, but

2   no, he… he was… he was coached and counseled on, you know, reporting

3   to work on time.

4   R:   Okay.   Now on the final event what was the day that that

5   happened on?

6   LOFTUS:  Uh… okay, hold on a minute.   Mmm Mmm…

7   R:   I assume that was right around the…

8   LOFTUS:  I've just got to pull out a file.   I…

9   R:   I assume it was right around April the 2nd, right, or…

10  LOFTUS:  Uh… well, act… yeah, it would be… it would be a couple… uh,

11  because there was an investigation…

12  R:   Couple days before?

13  LOFTUS:   … held and all that kind of stuff.

14  R:   Okay.   So it would have… it would have been in that week,

15  though?   It… it…

16  LOFTUS:  Uh, act… act… well, no.   It was actually, uh… it happened…

17  uh, let's see here.   Uh, 13 March.

18  R:   March the 13th.   Okay.

19  LOFTUS:  Was the actual date.

20  R:   And what time was he supposed to be in Chicago?   Do you know

21  offhand?

22  LOFTUS:  2 p.m.

23  R:   And what time did he arrive?

24  LOFTUS:  3 p.m.

25  R:   And what… I assume he was late.

26  LOFTUS:  That is correct.

27  R:   Was the flight delayed?

1    LOFTUS:   Uh, he was actually, uh, on a United flight at the time and
2    I believe that flight was late.

3    R:   But the flight that he was gonna leave the… the plane he was
4    gonna fly or be the First Officer on, was that delayed?

5    LOFTUS:   Well, actually, the day in question, uh, Josh was, uh,
6    assigned to sit what we call ready reserve at the airport.   We call
7    it standby.

8    R:   Yeah.

9    LOFTUS:   And… and basically, you sit in the crew lounge and we
10   have like recliners and a quiet room to relax and basically
11   you're sitting there waiting for another pilot to call in sick
12   or twist his ankle or something, so that the flying public won't
13   be…

14   R:   Okay.

15   LOFTUS:   … you know, delayed.   So…

16   R:   And he had to be there in order to be standby.

17   LOFTUS:   Yeah.   Basically.

18   R:   Okay.   Now, uh, you're saying he didn't get in 'til 3:00 but
19   someone signed him in at 2:00.

20   LOFTUS:   Yeah.   Actually, 1:56 someone signed him in.

21   R:   Who signed him in, just another pilot or…

22   LOFTUS:   Another pilot.

23   R:   And I assume in order to do that he would be signed in on the
24   computer and you've got to give him some sort of a number to do
25   that?

26   LOFTUS:   Yeah, a… a… a pass code to get into the (inaudible)
27   system.

1   R:   Alright.   Uh, after you found out about it did you get a chance
2   to talk to him about this event?

3   LOFTUS:   Uh, yes, I did.

4   R:   Okay.   Did he acknowledge that he asked another pilot to do this
5   for him?

6   LOFTUS:   Not at the initial meeting.   The day in question, uh, uh... I
7   asked Josh to stop in or I saw him and I said, please come see me or
8   called him... I can't remember exactly.   And I asked him if he had
9   anything to say to me about, you know, him... you know, his signing
10  in, him... him... you know, him reporting to work today.   And at that
11  time he said no.   And I said, "Well, I'm gonna have to withhold you
12  from service at this time and conduct and investigation."   And then
13  subsequently, at the investigation, Josh did say that he had a
14  friend of his sign him in.

15  R:   Okay.   Then did he give a reason why?

16  LOFTUS:   Uh, he was, uh, worried about being late again because
17  I had already, uh... uh, spoken to him about being late the week
18  prior.

19  R:   Okay.   If he would not have been, uh... if he would have signed in
20  himself but just signed in late, would he have been dismissed for
21  being late or would he have just been counseled for that?

22  LOFTUS:   Uh, he would have uh... let's see... he was already counseled
23  for being late, so he would have either been counseled or given a
24  written reprimand.

25  R:   But he still would have had his job?

26  LOFTUS:   That's correct.

27  R:   Okay.   Anything, uh... well, the one other question I have... well,

1   I've got two other questions and that is did… was he actually needed
2   on standby at 2:00 that day or…

3   LOFTUS:  Uh, yeah.  The… you're always needed on standby.

4   R:  Okay.

5   LOFTUS:  I don't know if they had a specific exact flight assignment
6   for him at 2:01 or whatever, but…

7   R:  Okay.

8   LOFTUS:  … you know, you're… you're… the company expects you to be
9   here, the company, via the computer record, thought he was here when
10  in actual… you know, in reality, he was not here.

11  R:  Okay.  Was there a flight that was delayed, if you know, because
12  of this or no?

13  LOFTUS:  Not… not that I can recall.   I… I wouldn't know in a
14  specific flight that he was assigned.

15  R:  Alright.  And then the last question is how was the Employer
16  harmed by this?

17  LOFTUS:  Uh, the Emplo… the Employer was harmed by the pilot
18  basically lying, uh, to the company and falsifying records and
19  also the fact that at the time we were supposed to have a ready
20  reserve pilot available to cover open flying.  There, in reality, as
21  none.

22  R:  Alright.  Mr. Flor… okay.  Anything else, Mr. Loftus, you want
23  to tell me?

24  LOFTUS:  No.  Just, uh, that those documents, which I think they're
25  all… they've all gotten entered, so just the ones I faxed to
26  you.

27  R:  Okay.  Mr. Flores, anything you want to ask Mr. Loftus before I

1   ask you some questions?

2   CL:    I  totally  object  to  the  whole  story  of  what  Mr.  Loftus

3   (inaudible).  Uh…

4   R:  Okay.  If you have a question just…

5   CL:  Okay, uh…

6   R:  … just ask it.

7   CL:    Um,  okay.    Frank,  um…  you  said  that  I  was  coached  and

8   counseled, is that correct?

9   LOFTUS:  Yes.

10  CL:    Okay.    Is  there  any  documentation  of  me  being  coached  and

11  counseled that you supposedly said that you coached and counseled me

12  for rul… for a violation of Rule 5?

13  LOFTUS:  No.  I… I didn't coach and counsel you for…

14  CL:  Okay.

15  LOFTUS:  … a violation of Rule 5.

16  CL:  Okay.  Well, you… if I'm not mistaken correctly, I believe you

17  sta… you stated to, uh, this gentleman here that you had coached and

18  counseled me for the signing in issue.

19  LOFTUS:  No.  I… I said I coached and counseled you for being late

20  the week prior.

21  CL:    Okay.    So  let's  go…  alright.    So  let's  be  on  more  specific

22  terms  then.    When  did  you  coach  and  counsel  me  and  documentation

23  stated that you coached and counseled me for being late for work/

24  LOFTUS:    I  coached  and  counseled  you  verbally  and  I  said  to  you,

25  "Josh, I need to see you regarding your sick… your, uh, being late

26  last week."  And you said, "Absolutely, Frank, I'll stop in and see

27  you.

1  CL:  Okay.  That… I… I… okay.  That is not a coach and counsel.

2  R:  Okay.  Well, we're not gonna…

3  CL:  A coach and cou…

4  R:  We're not gonna argue.  Just (inaudible)…

5  CL:  Oh, okay.  (inaudible)  Alright.

6  R:  (inaudible)

7  CL:  I have, um… now… now the whole thing about… the whole coach and

8  counsel thing, I didn't know I had a late report on my… in my… on my

9  report until Mr. Frank Loftus called me.

10  R:  I'll let you testify to that in a minute.  Uh, now…

11  CL:  Oh, okay.

12  R:  I asked you if you had a question to ask him.

13  CL:  Um… Frank, so you're also saying that I was, uh…uh… violated

14  for fals… falsification of timecard?

15  LOFTUS:  Uh, no.  That… that… that was the complaint that the

16  company gave to the, uh… uh… this gentleman, John.  I… uh…

17  CL:  Okay.

18  LOFTUS:  Actually, pilots don't have timecards, John, we sign in

19  using the (s/l) FOSS computer system.  It's not like an actual

20  punching in, but basically that's the gist of the issue.

21  R:  I assume he's paid based upon, uh, whether, you know, once he

22  was available, right?

23  LOFTUS:  Right.

24  R:  Okay.  Any other questions?

25  CL:  Um, and so I… I object to that as well.  Um, and also I object

26  to, uh, your Rule 34.  Uh, you're saying that I was violated with

27  the Rule 34 and you're… you're saying that I was dishonest, is that

1   correct?  Is that correct, Frank?

2   LOFTUS:  That… that's… Rule 34 is dishonesty of any type.

3   CL:  Okay.  Um, actually, Rule 34 states that dishonesty of any kind

4   in such relation…

5   R:  Yeah.

6   CL:  … to theft or pilferage.

7   R:  I can read it.

8   CL:  Okay?  So basically the company is testifying…

9   R:  Any other… any other questions?

10  CL:  … the company is…

11  R:  I can figure it out.  Any other questions?

12  CL:  Oh, oh, okay.  Okay.  No.  Uh, no, I got… got no other

13  questions, sir.

14  R:  Okay.  Mr. uh… Flores, you were dismissed, correct?

15  CL:  Oh, oh, actually I do have one more question.

16  R:  Okay.

17  CL:  Uh, Frank, the guy that was, uh, directly involved in my

18  situation, uh, was he discharged?

19  LOFTUS:  Uh, does that have any bearing on your case?

20  R:  I'll, uh… I'll allow the question.  Was the employ… other pilot

21  who entered the information also discharged?

22  LOFTUS:  No.

23  R:  Okay.  Well, why wouldn't he be discharged?

24  LOFTUS:  Because that person, in my investigation before it started,

25  came to me and said, "Frank, you know, I really screwed up.  Josh is

26  a friend of mine, we went to school together, he asked me to do him

27  this one favor one time and I did it.  And I thanked the pilot for

1  his honesty and that pilot was actually given what we call a career

2  decision day, which basically means we have the goods to fire you,

3  but we are deciding that you're a good employee and we need to keep

4  you.

5  R:  Okay.  Any other questions?

6  CL:  Yes, I got a few more questions.  Frank, uh, pertaining to me

7  and this other employee, uh, disciplinary history… um… has he had

8  any prior disciplinary history?

9  R:  Okay, I don't think I'm gonna go into that topic, though.

10  CL:  Oh, oh, okay.  Alright.  Okay.  So basically, we understand

11  that I was… I was, uh, uh… okay.  So, Frank, when we had our initial

12  meeting where I was represented by union as… as my right as an

13  employee…

14  LOFTUS:  Mmm hmm.

15  CL:  … did I or did I not confront and tell you everything honestly

16  up front?

17  LOFTUS:  Uh, I believe in our investigation you were honest, but on

18  the day of the incident I asked you if you had anything to say to me

19  about you signing in today and you said no, you didn't.

20  CL:  Okay.  I disagree with that statement.  You specifically said

21  that day, "Was there anything that you needed to tell me?"  And… and

22  I then told you, "Frank, I was running late," and I also called crew

23  scheduling three times to let them know that I was gonna be running

24  late and also the flight that I was getting on and also that there

25  was ATC delays.

26  R:  Okay.

27  CL:  Would you concur that?

1   R:  Does that… does that have a question that was asked and was that

2   how he…

3   LOFTUS:  I… I… I don't….

4   R:  … answered?

5   CL:  I'm sorry?

6   R:  Was that how the question was asked, Mr. Loftus?

7   LOFTUS:  Uh… uh, which question was that?

8   R:  Okay.

9   LOFTUS:  Did you…

10   R:  I was kind of thrown.

11   LOFTUS:  Did you…

12   R:  Mr. Flores, when I picked up the phone you said, "Well, I only

13   got 10 minutes," and I was kind of rushing through, uh, so…

14   CL:  Yeah, I… I had a… I…

15   R:  I would have slowed up and handled the hearing a little

16   differently if I would have known that…

17   CL:  Okay, yeah.  I… I… I already… I already went in there and let

18   them know that I'm on an important phone call, but I probably don't

19   have too much time left.

20   R:  Alright.  Okay.  Okay.

21   CL:  So uh…

22   R:  Okay.  So the question is what?

23   CL:  So the question is here… is was… when… when this in… when this

24   happened, when the incident happened, when you pulled me in that

25   same day, did you ask me…

26   R:  You can… you can pretty much… here, why don't we do it this way.

27   You can testify when it's your turn and just tell me what you said